FILED

2014 FEB -3 PM 1:12

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY: _____

1  Hugh Hewitt (#140503)
   hhewitt@hewittwolensky.com
2  Elizabeth V. McNulty (#192455)
   emcnulty@hewittwolensky.com
3  Kimberly A. Carasso (#185110)
   kcarasso@hewittwolensky.com
4  HEWITT WOLENSKY & McNULTY LLP
   4041 MacArthur Blvd., Suite 300
5  Newport Beach, CA 92660
   Telephone: (949) 783-5050
6  Facsimile:  (949) 783-5051

7  Attorneys for Plaintiff,
   Richard McKenzie
8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12  RICHARD MCKENZIE,                    CASE NO. SACV14-00149 JVS (JPRx)

13              Plaintiff,               **COMPLAINT FOR DAMAGES AND
                                         DEMAND FOR JURY TRIAL**
14  vs.

15  THE REGENTS OF THE
    UNIVERSITY OF CALIFORNIA;            CTRM:
16  GARY MATKIN; COURSERA, INC.;         JUDGE:
    DAPHNE KOLLER, and Does 1-10,        MAGISTRATE:
17  Inclusive.
                                         DATE OF FILING :
18              Defendants.              TRIAL DATE:    None

19

20

21      Plaintiff, Richard McKenzie, by and through his attorneys, for his Complaint

22  against Defendants, The Regents of the University of California, Gary Matkin,

23  Coursera, Inc. and Daphne Koller, alleges as follows:

24                    **JURISDICTION AND VENUE**

25      1.   The Court has original jurisdiction over McKenzie's claims pursuant

26  to:

27          (a)   42 U.S.C. §1983; and

28          (b)   the Court's supplemental jurisdiction, 28 U.S. C. §1367.

COMPLAINT FOR DAMAGES

49099

- 1 -

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 390
Newport Beach, California 92660
(949) 783-5050

2.  Personal jurisdiction over Defendants exists because each Defendant is a citizen and/or domiciled in the United States and California and has engaged in substantial activities within California relevant to this action, and within the Central District of California, including but not limited to continuous and systematic business transactions.

3.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## NATURE OF THE ACTION

4.  The Regents, in an attempt to make financial gain, duped a distinguished and well-respected professor into providing the course materials that he had prepared following his retirement and that The Regents knew he intended to be a source of income during his retirement.  Then, when plaintiff began to criticize The Regents and its business partner and in order to hide their misconduct, they began a defamatory campaign and summarily drummed the professor out of his teaching position by severely criticizing his competency and painting a false picture concerning his disengagement from the course. The Regents have since admitted it breached a duty to protect the professor's intellectual rights.  As a result of the Defendants' actions, the professor sustained irreparable damage to his reputation, both professionally and personally, as well as significant economic damage due to the loss of his intellectual property rights.

## THE PARTIES

5.  Plaintiff, Richard McKenzie, is an individual and citizen of California.

6.  McKenzie is the nationally-recognized Walter B. Gerken Professor Emeritus of Enterprise and Society in the Paul Merage School of Business at the University of California, Irvine ("The University").  He taught more than twenty years at The University as a chaired professor in the field of economics and he was extremely well-respected by his peers, colleagues, and students.

7.  The standing and reputation of a professor of McKenzie's stature cannot be over-emphasized.  In academia, reputation means everything.

COMPLAINT FOR DAMAGES

8.      Defendant, The Regents of the University of California ("The Regents"), is a corporation that administers the University of California, a public trust.

9.      The Regents possess the power to sue and be sued.  Cal. Const. Art. 9, §9.

10.     Defendant, Gary Matkin, is an individual and citizen of California.

11.     Matkin is being sued both in his individual capacity and in his official capacity as Dean of the Extension program for The University, one of The Regents' campuses and sub-programs ("Extension").

12.     Defendant, Coursera, Inc. ("Coursera"), is a Delaware corporation, with its principal place of business in Mountain View, California.

13.     Coursera is a for-profit educational technology company offering massive open online courses (MOOCs).

14.     Defendant, Daphne Koller, is an individual and citizen of California.

15.     Koller is being sued both in her individual capacity and in her official capacity as a Founder and Officer of Coursera.

16.     McKenzie is ignorant of the Defendants' true names and capacitiessued herein as Does 1-30, inclusive, and therefore sues these Defendants by such fictitious names and capacities. McKenzie will amend this complaint to allege their true names and capacities when ascertained. McKenzie is informed and believes and on that basis alleges that each fictitiously-named Defendant is responsible in some manner for the occurrences herein alleged, and that his injuries were proximately caused by the conduct of such Defendant.

17.     All of the Defendants, including the Doe Defendants, are alleged to be co-conspirators with each other, in that each agreed to participate and participated in the furtherance of the objective of a civil wrong as alleged in this Complaint.

18.     McKenzie is informed and believes and thereupon alleges that each Defendant entered into a conspiracy and agreement with the other Defendants

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

1   and/or subsequently joined said conspiracy and ratified the prior acts and conduct

2   of the Defendants who had previously entered into said conspiracy. McKenzie is

3   currently unaware of when each Defendant joined said conspiracy, unless otherwise

4   stated and, upon information and belief, alleges that all Defendants have

5   knowingly, maliciously, and willfully entered into said conspiracy, which continues

6   until this day. The purposes of this ongoing conspiracy include, but are not limited

7   to, the wrongs alleged herein. All Defendants' acts and failures to act as alleged

8   herein were perpetrated in furtherance of the ongoing conspiracy.

9        19.    McKenzie is informed and believes and thereupon alleges that at all

10   times material herein, each Defendant was completely dominated and controlled by

11   his or her co-Defendants, each was the agent, representative, and alter ego of the

12   others, and all aided and abetted the wrongful acts of the others.

13       20.    Whenever and wherever this Complaint refers to any act by a

14   Defendant or Defendants, such allegations and references shall also be deemed to

15   mean the acts and failures to act of each Defendant acting individually, jointly,

16   and/or severally.

17       21.    McKenzie is informed and believes and thereupon alleges that at all

18   times material herein, each of the Defendants was the agent, employee and/or joint

19   venturer of, or working in concert with, co-Defendants and was acting within the

20   course and scope of such agency, employment, and/or joint venture or concerted

21   activity. To the extent that said conduct and omissions were perpetrated by certain

22       22.    Defendants, McKenzie is informed and believes and thereupon alleges

23   that the remaining Defendant and/or Defendants confirmed and ratified said

24   conduct and omissions.

25       23.    Whenever and wherever reference is made in this complaint to any act

26   by a Defendant and/or Defendants, such allegations and references shall also be

27   deemed to mean the acts and failures to act of each Defendant acting individually,

28   jointly, and/or severally.

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

49099

- 4 -

24.     Whenever and wherever reference is made to individuals who are not named as Plaintiffs or Defendants in this complaint but are or were Defendants' employees/agents, or any of them, such references shall be deemed to mean that such individuals at all relevant times acted on Defendants' behalf within the scope of their employment.

## GENERAL ALLEGATIONS

25.     Based upon information and belief, McKenzie alleges the following:

**The Regents/Coursera Contract**

26.     In 2012, The Regents and Coursera approached McKenzie about teaching a microeconomics course. The course would be offered on Coursera's MOOC educational platform through Extension, commencing in January 2013.

27.     Defendants made representations to McKenzie that he would be able to reach tens of thousands of students through the course. This did not appear to be an over-estimation when 37,000 students signed up for McKenzie's course within days of its opening.

28.     Moreover, Defendants made repeated representations both orally and in writing that:

      (a)     McKenzie owned all intellectual property rights in his course materials;

      (b)     If Defendants intended to make money from McKenzie's course materials, he would have to be involved in the negotiations and the videos would only be made available via streaming download during the life of the course. Defendants represented that both of these safeguards were meant to protect McKenzie's intellectual property; and

      (c)     no contract existed as of the date of the start of the course concerning licensing.

29.     Based upon these representations, McKenzie agreed to further develop

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5650

1   and manage his ten-week course, Microeconomics for Managers ("The Course").

2         30.    At the time that Defendants made the statements identified above, they

3   knew them to be false.

4         31.    Defendants knew the enrollment count was meaningless.  Based upon

5   historical indicators and as demonstrated by what happened with The Course:

6               •      fewer than 40 percent of the students actually logged in during

7                      each of the first two weeks;

8               •      only a small percentage of enrolled students do so much as

9                      watch a single video lecture; and

10              •      fewer than 2 percent actively engaged in the discussions.

11        32.    Moreover, in actuality, in September of 2012, The Regents and

12   Coursera entered into a contract ("The Contract") wherein The Regents –

13   purporting to act as McKenzie's agent – provided Coursera with a "non-exclusive,

14   worldwide license to reproduce, distribute, publicly display and publicly perform"

15   Professor McKenzie's course materials.  Attached as **Exhibit "1"** to this Complaint

16   is a copy of The Contract.

17        33.    The Regents knew that Cambridge University Press, the publisher of

18   McKenzie's textbook and McKenzie would not provide such a broad and expansive

19   license because requests to make just the textbook content downloadable free of

20   charge were summarily rejected.  Nevertheless, The Regents entered into The

21   Contract.

22        34.    The Regents never obtained McKenzie's consent to the terms of The

23   Contract even though The Contract expressly required The Regents to do so.

24        35.    McKenzie was not a party to The Contract. He did not have any input

25   into the terms of The Contract nor was he was never provided a copy, nor apprised

26   of the terms, before The Regents and Coursera agreed to the terms.

27   ///

28   ///

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

36.     Defendants only provided McKenzie with a copy of The Contract to review the night before The Course commenced, and only then produced in such a way as to confound any non-lawyer.

37.     McKenzie did not enter into any written contract with Coursera concerning The Course.  The Regents entered into a contract with Coursera.

38.     When McKenzie agreed to provide and manage The Course, he did not ask for compensation.

39.     McKenzie did not receive any payment for developing or managing The Course.  Rather, just before The Course opened, The Regents offered to pay McKenzie $2,500.00 for devoting up to two hours/week to monitor The Course's discussion forums.

40.     In addition, McKenzie, The Regents and Coursera, based upon discussions the parties had leading up to the commencement of The Course, including discussions had before McKenzie agreed to teach The Course, understood that McKenzie's fifty-eight, thirty-minute lectures would be tied to the chapters in his textbook.  Accordingly, McKenzie planned to recommend (not require) that students in The Course purchase his textbook, *Microeconomics for MBAs* (Cambridge University Press, 2010).  McKenzie viewed this as an opportunity to create the potential for indirect compensation from teaching The Course.

41.     McKenzie intended to recommend his textbook and point out the ties between his lectures and his textbook.  His textbook *recommendation* was clearly laid out in McKenzie's course syllabus, the first draft of which he submitted to Defendants well before the class began.

42.     Throughout The Course, McKenzie provided his students with potential resources to obtain the information contained in his textbook if they could not/did not want to purchase the textbook.

43.     During the development of The Course, McKenzie advised Defendants that he intended to market a five-DVD set of his fifty-eight lectures that he had

1  produced at his own expense.

2      44.    Moreover, at the request of The Regents and Coursera, McKenzie

3  provided a substantial number of supplemental materials for The Course, including

4  at least one section from every chapter in his textbook.  These course materials

5  were not contemplated when McKenzie agreed to teach The Course.  These course

6  materials were made available to his students free of charge.

7      45.    Defendants knew that McKenzie intended to offer the video courses

8  for sale via DVD if students wanted to access the classes after the classes ended

9  and/or if they wanted to be able to access them on the hard drive.  He made this

10  point clear in multiple communications as well as his class syllabus.

11      46.    Nevertheless, no one alerted McKenzie to the fact that The Regents

12  had signed these rights away to Coursera.

13      47.    Defendants never told McKenzie that the enrollment numbers were

14  illusory and that the potential revenue stream related to sales of products related to

15  The Course was significantly less than what had been represented.

16      48.    The Regents did not fully or even partially disclose to McKenzie until

17  the night before The Course went online that it had an agreement with Coursera

18  covering exactly what would happen to his course once it went online, but instead

19  repeatedly pretended to him that it had no knowledge on key issues because "this

20  case went ahead so quickly that the whole IP thing lagged behind."

21      49.    Instead, The Regents repeatedly told McKenzie that he owned all

22  intellectual property rights and the videos would only be available via streaming

23  downloads to students during the life of The Course.  This was, in fact, not a

24  truthful statement.

25      50.    The lectures were made available for free downloading and they were

26  made available through and even after the class ended – and to students and non-

27  students alike. As a result, more than 230,000 downloads of McKenzie's video

28  lectures have been made since The Course began and videos are now available on

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-3050

COMPLAINT FOR DAMAGES

YouTube.

51.    Moreover, Defendants encouraged students to download all materials as quickly as they could in an attempt to extend the free and unrestricted downloads of the lectures beyond the term of The Course.

52.    As a result, thousands of complete sets of the lectures are now held by people around the world and there is nothing stopping them from further pirating the videos.

53.    As a result of the Defendants' conduct, McKenzie has suffered a loss of intellectual property rights and will suffer a loss of future economic advantage in that his lectures, course materials and video sets now have no real value.

54.    The Regents, following a lengthy investigation into McKenzie's complaints, admitted that it failed "to have safeguards in place that would protect the intellectual property rights of Professor McKenzie prior to the release of his course on the Coursera platform.  Attached as **Exhibit "2"** to this Complaint is a copy of The Regents' January 24, 2014 letter acknowledging the breach.[1]

55.    As a result, Defendants destroyed McKenzie's intellectual property which he had painstakingly constructed on his own time and which he made available to The Regents only after relying on their multiple misrepresentations.

**Koller's and Matkin's Defamatory Comments**

56.    On February 5, 2013, at a dinner attended by Matkin, Koller, and several other individuals affiliated with The Regents and Coursera, Koller made statements to the group that McKenzie's communications with students, which

---

[1]  McKenzie is informed and believes that The Regents entered into this contract related to other courses and thereby deprived other professors of their respective intellectual rights.  By admitting that The Regents' breached McKenzie's rights, they have also admitted that they breached these other individuals' rights.  By contesting The Regents' conduct in this case, McKenzie has thus enforced an important right affecting a public interest and conferred a significant benefit upon a large class of persons.  As such, McKenzie will seek attorneys' fees pursuant to Cal. *Code of Civ. Proc.* §1021.5.

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-9050

49099

COMPLAINT FOR DAMAGES

1  were meant to engage unengaged students, were academically offensive.

2      57.    Koller's statements, made publicly, were meant to force The Regents

3  to terminate McKenzie's involvement with The Course.

4      58.    These statements were in fact false.

5      59.    In actuality, McKenzie had pressed unengaged students to become

6  engaged – watch lectures and undertake readings – before clogging the discussion

7  forums with ill-informed comments.

8      60.    Moreover, McKenzie advised students that he would not concede his

9  academic standards in The Course to accommodate unengaged students who were

10  not completing assignments.

11      61.    On February 6, 2013, Matkin repeated Koller's false statements when

12  he publically denounced McKenzie during a coffee with several colleagues.  During

13  the discussion, Matkin told the attendees that McKenzie "was an embarrassment to

14  the University and [McKenzie's] conduct related to The Course threatened the

15  reputation of the University…When she [Koller] began to read what [McKenzie]

16  had written to [his] students, I was never more embarrassed personally and for the

17  University in my career."

18      62.    These statements were false and caused – and will continue to cause –

19  irreparable harm to McKenzie's reputation.

20      63.    For a University that has endured multiple noteworthy scandals --

21  fertility, Willed Body Program, Liver Transplant Program, falsification of records

22  by anesthesiologist, the hiring-firing-rehiring of its founding law school dean, and a

23  $1,200,000.00 settlement related to a federal whistleblower lawsuit -- this was an

24  astonishingly devastating – and unfounded -- public ridicule of an esteemed

25  member of the University community.

26      64.    Matkin made his statements during the coffee without checking the

27  quality of The Course McKenzie developed, McKenzie's management of The

28  Course, or the context in which the purportedly offensive statements were made.

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

65.     Had Matkin conducted any due diligence, he would have seen that in the allegedly offensive statements, McKenzie was in fact pressing the multitude of unengaged students to work more diligently in The Course by working their way through the lecture and reading assignments.

66.     In addition, McKenzie wrote numerous pages of economic commentaries, from which the presumed offending passages were drawn, that accomplished the intended effect of substantially upgrading the quality of The Course and student engagement.

67.     During the coffee, Matkin offered McKenzie a buyout to disengage after only two weeks of The Course.  The buyout was meant to effectively silence Mckenzie on his criticisms of the MOOC concept and conflicts he had had with Coursera and The Regents concerning The Course (see below).

68.     Given the bullying and strong-arm tactics that began at the coffee, McKenzie felt he had no option but to capitulate to Defendants' wishes and disengage from The Course.

69.     Thereafter, Defendants cast additional false light upon McKenzie by making untruthful media accounts.  These are additional assaults on his reputation.

70.     Koller and Matkin falsely advised the media that McKenzie voluntarily disengaged from The Course.

71.     Matkin effectively told everyone who asked – including the media – that McKenzie's disengagement was autonomous and had nothing to do with Matkin.

72.     Similarly, when reporters called for Matkin's comment on the reasons for McKenzie's disengagement, Matkin trivialized McKenzie's reasons for disengagement; blamed the situation on McKenzie's naiveté of MOOCs; and pointed to McKenzie's lack of experience in dealing with large and diverse student populations.  In actuality, The Regents lacked an understanding of Coursera's MOOC platform and the attendant complications that arose from "massive" and

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

COMPLAINT FOR DAMAGES

"open" online courses.

73.     Matkin's statements, meant to throw McKenzie under the proverbial bus, failed to mention steps McKenzie took to deal with the emerging problems with The Course.

74.     Moreover, The Regents made statements and/or inferences that McKenzie engaged in rank commercialism and violated University policy related to the sale of his textbook.

75.     All of these statements were false and/or misleading and besmirched McKenzie's personal reputation and subjected him to public ridicule by portraying him as someone totally derelict in duty.

76.     Students in the MOOC and commentators in Internet forums called into question McKenzie's ethical and academic integrity for caving over his commitment to The Course on what they incorrectly believed based upon the false reports to be inconsequential reasons.

77.     Individuals falsely speculated that McKenzie disengaged only because he sold all of the textbooks he could and saw no reason to stick with The Course.

78.     Others, based upon Defendants' misrepresentations, concluded that McKenzie did not have the requisite integrity and professional ethics to hold to his commitment to The Course and his students.

79.     Contrary to statements and inferences made by The Regents and Coursera, McKenzie's disengagement was not of his own volition, nor was it the result of him lacking the requisite professional ethics and integrity to honor his commitments, as some commentators and students, incorrectly deduced from the derogatory statements made by The Regents and Coursera.

80.     On the contrary, in McKenzie's attempts to press students to work diligently in The Course, he sought to uphold the highest of academic and professional standards for ethics and integrity.  It was only when he was bullied, publicly ridiculed and harassed for his efforts, that he felt no option but to

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

COMPLAINT FOR DAMAGES

disengage from The Course.

81.     As a result of Defendants' conduct, McKenzie has suffered significant damage to his property, business, trade, profession and occupation.  In addition, his reputation has suffered significant harm.  Moreover, McKenzie has sustained significant emotional injuries in the form of shame, mortification and hurt feelings.

82.     The Regents' Violation of McKenzie's Due Process Liberty Interests

83.     Two months before The Course was set to commence, McKenzie submitted his syllabus.  It included his grading policy.

84.     Three days before The Course was to open, The Regents deleted McKenzie's grading policy – without permission -- because of objections from Coursera.

85.     This began a series of conflicts between McKenzie and The Regents concerning how he would teach The Course.

86.     The Regents reinstated McKenzie's grading policy only after he threatened to cancel The Course if it were not.

87.     Similarly, before The Course opened, McKenzie submitted ten weekly discussion problems with the expectation that one of the problems would be posted each week.

88.     Without permission or informing McKenzie, The Regents refused to post the discussion problem for the fourth week, possibly for sensitivity reasons. In doing so, The Regents usurped McKenzie's professional rights in The Course.

89.     As set forth above, The Regents forced McKenzie to disengage after he pressed unengaged students to become engaged and advised students that he would not concede his academic standards in The Course to accommodate unengaged students who were not completing assignments.

90.     Within two hours of advising The Regents that its conduct left him no choice but to disengage, McKenzie was demoted on the platform– at Matkin's order – from the status of "professor" to "student."

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

91.     As a result and in a further attempt to silence McKenzie, The Regents' actions precluded McKenzie from posting an explanation to students.

92.     McKenzie was not reinstated as a "professor" on the platform until he warned Coursera that if he were not, there would be a significant public relations disaster.   By then, however, the damage was already done because once The Regents made the announcement that McKenzie was no longer teaching The Course, the student population was never the same.

93.     Similarly, The Regents rejected his offer to return to full engagement under the agreement that was in force at the time of his disengagement.

94.     After his disengagement, The Regents set aside McKenzie's announced grading policy – again without permission.  The Regents instituted their own grading policy, without informing students of the change in grading policies or the fact that McKenzie's name would no longer be set forth on the Certification of Completion.

95.     The Regents':

(a)     interference with Professor McKenzie's teaching;

(b)     abrupt cut-off of his access to the students; and

(c)     unilateral, unjustified censorship of his communication with his students both via the cut-off ;

(d)     the cancellation of his problem-set;

(e)     and the replacement of his grading policy announced on his syllabus with one demanded by Coursera without first consulting with McKenzie or even informing him (or the students) of the change in grading policy;

represent unconstitutional interference with McKenzie's academic and First Amendment rights prohibited by 42 U.S.C. §1983 and by the standards governing academic freedom by The Regents.

McKenzie timely submitted a Claim to The Regents as required by California

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

law.

## COUNT I

### (BREACH OF FIDUCIARY DUTY)

96.   McKenzie repeats and realleges each and every allegation set forth above as if fully set forth in this count.

97.   As McKenzie's employer, The Regents owed McKenzie the duties of care, utmost honesty, loyalty, fidelity, and full, complete, and accurate disclosure of all facts pertinent to acts committed by The Regents that concern or affect McKenzie.  At all times, The Regents were obligated to place McKenzie's interests above The Regents' own to avoid conflicts of interest, and to never take advantage of The Regents' position of trust to McKenzie's detriment.

98.   The Regents, by their own admission, breached the fiduciary duty owed to McKenzie.

99.   The Contract The Regents entered into with Coursera – without McKenzie's knowledge or consent -- released his right to his intellectual property *ad infinitum*.

100.  Moreover, The Regents did not object when Coursera made McKenzie's lectures available for free downloading.  The lectures are available for downloading by anyone, even non-students and as a result, have been downloaded more than 230,000 times.

101.  By taking the above-mentioned actions, The Regents proximately caused McKenzie's damages.

102.  Based upon the foregoing, McKenzie is entitled to damages from Defendants in an amount to be determined at trial.

103.  Further, Defendants' unlawful conduct, and each of them, as alleged in this Complaint, was and continues to be malicious, fraudulent, despicable, and/or oppressive in that Defendants, and each of them, acted with full knowledge of the consequences to McKenzie as alleged in this Complaint, with the intent to violate

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-3030

49099

COMPLAINT FOR DAMAGES

McKenzie's rights, and/or with a willful, conscious, wanton, and reckless disregard for McKenzie's rights and for the deleterious consequences and cruel and unjust hardship resulting to McKenzie  Consequently, McKenzie is entitled to exemplary and punitive damages in an amount to be proven at trial.

## COUNT II
## (CONVERSION)

104.   McKenzie repeats and realleges each and every allegation set forth above as if fully set forth in this count.

105.   Beginning in January 2013 and continuing thereafter, The Regents and Coursera converted to their own use property owned by McKenzie.  The property converted consists of The Course materials and lectures.

106.   The property is worth more than $230,000.00.

107.   Based upon the foregoing, McKenzie is entitled to damages from Defendants in an amount to be determined at trial, but exceeding $230,000.00.

108.   Further, Defendants' unlawful conduct, and each of them, as alleged in this Complaint, was and continues to be malicious, fraudulent, despicable, and/or oppressive in that Defendants, and each of them, acted with full knowledge of the consequences to McKenzie as alleged in this Complaint, with the intent to violate McKenzie's rights, and/or with a willful, conscious, wanton, and reckless disregard for McKenzie's rights and for the deleterious consequences and cruel and unjust hardship resulting to McKenzie  Consequently, McKenzie is entitled to exemplary and punitive damages in an amount to be proven at trial.

## COUNT III
## (NEGLIGENCE)

109.   McKenzie repeats and realleges each and every allegation set forth above as if fully set forth in this count.

110.   The Regents owed McKenzie a duty of care to protect his intellectual property rights.

49099

- 16 -

COMPLAINT FOR DAMAGES

111.  The Regents, by their own admission, failed to do so.

112.  The Contract – to the extent that it contracts away significant monetary rights of a non-party -- is unconscionable.  The fact that a fiduciary acting purportedly on behalf of the individual it represented would enter into such a contract is even more unconscionable and amounts to gross neglect (especially since The Contract was drafted, negotiated and reviewed by counsel and a party acting as his fiduciary).

113.  As a result of The Regents' breach of this duty, McKenzie suffered damages.

114.  Based upon the foregoing, McKenzie is entitled to damages from Defendants in an amount to be determined at trial.

## COUNT IV

## (FRAUD)

115.  McKenzie repeats and realleges each and every allegation set forth above as if fully set forth in this count.

116.  Defendants duped Professor McKenzie into providing The Course materials that he had prepared following his retirement – and that Defendants knew he intended to be a source of income during his retirement – so that Defendants could make them the subject of the Extension/Coursera contract and use them to Defendants' financial benefit.

117.  Had Professor McKenzie known that Defendants' misrepresentations were false, he would have immediately withdrawn his materials from potential usage and/or never agreed to teach The Course and make his materials available.

118.  As a result of Defendants' misconduct, McKenzie has suffered damages in an amount to be proven at trial.

119.  Further, Defendants' unlawful conduct, and each of them, as alleged in this Complaint, was and continues to be malicious, fraudulent, despicable, and/or oppressive in that Defendants, and each of them, acted with full knowledge of the

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

COMPLAINT FOR DAMAGES

49099

consequences to McKenzie as alleged in this Complaint, with the intent to violate McKenzie's rights, and/or with a willful, conscious, wanton, and reckless disregard for McKenzie's rights and for the deleterious consequences and cruel and unjust hardship resulting to McKenzie  Consequently, McKenzie is entitled to exemplary and punitive damages in an amount to be proven at trial.

**COUNT V**

**(VIOLATION OF SECTION 42 U.S.C. §1983)**

120.   McKenzie repeats and realleges each and every allegation set forth above as if fully set forth in this count.

121.   Government employers are prohibited from depriving government employees of their constitutionally protected liberty interests without due process. When a government employer:

- Seriously attacks a government employee's competency to perform his job; and/or

- Creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge, the conduct is actionable because the government action imposes on the employee a stigma that forecloses his freedom to take advantage of other employment opportunities.

122.   As a result, the employer must provide notice and the employee an opportunity to be heard because the employee's good name, reputation, honor and integrity are at stake.

123.   The Regents made untruthful statements concerning McKenzie's competency to perform his job and created and disseminated a false and defamatory impression about McKenzie's disengagement.

124.   The Regents repeatedly made such statements publicly, including making representations to the press.

125.   The Regents made these statements without undertaking any steps to

49099

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

1    determine the veracity of the statements nor did The Regents present the matter before

2    the Academic Senate before taking action against McKenzie's employment.

3        126.   As a result, McKenzie suffered significant economic and emotional

4    damage and is therefore, entitled to damages from Defendants in an amount to be

5    determined at trial.

6                              **COUNT VI**

7        **(DEFAMATION PER SE – INJURY TO PROFESSIONAL REPUTATION)**

8        127.   McKenzie repeats and realleges each and every allegation set forth

9    above as if fully set forth in this count.

10       128.   Matkin's and Koller's statements described herein ("Statements")

11   concerned McKenzie and were false.

12       129.   Matkin's and Koller's Statements were widely published and not

13   privileged in any manner.

14       130.   Matkin's and Koller's Statements were made with reckless disregard of

15   their truth or falsity and/or with malice.

16       131.   Matkin's and Koller's Statements were defamatory per se because they

17   injure McKenzie's professional reputation.

18       132.   Matkin's and Koller's Statements forever falsely tainted and

19   permanently damaged McKenzie, in the eyes of McKenzie's colleagues, peers and

20   students as, among other things, an individual lacking the requisite professional ethics

21   and integrity to honor his commitments.

22       133.   This damage – given the reach of the internet – now extends globally.

23       134.   McKenzie will likely face difficulties in obtaining other employment and

24   entering new ventures as a result of Matkin's and Koller's Statements.

25       135.   Further, Defendants' unlawful conduct, and each of them, as alleged

26       136.   in this Complaint, was and continues to be malicious, fraudulent,

27   despicable,

28       137.   and/or oppressive in that Defendants, and each of them, acted with full

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

49099

COMPLAINT FOR DAMAGES

1   knowledge

2       138.   of the consequences to McKenzie as alleged in this Complaint, with

3   the intent to

4       139.   violate McKenzie's rights, and/or with a willful, conscious, wanton,

5   and reckless disregard for McKenzie's rights and for the deleterious consequences

6   and cruel and unjust hardship resulting to McKenzie  Consequently, McKenzie is

7   entitled to exemplary and punitive damages in an amount to be proven at trial.

8                               **COUNT VII**

9               **(DEFAMATION – RECKLESS DISREGARD/MALICE)**

10      140.   McKenzie repeats and realleges each and every allegation set forth

11  above as if fully set forth in this count.

12      141.   Matkin and Koller had no reasonable grounds for believing the truth of

13  his/her Statements.  Each relied on, at best, unsubstantiated hearsay, circumstantial

14  evidence, and lies in making the Statements.

15      142.   Matkin's  and  Koller's  Statements  forever  falsely  tainted  and

16  permanently damaged McKenzie, in the eyes of McKenzie's colleagues, peers and

17  students as, among other things, an individual lacking the requisite professional ethics

18  and integrity to honor his commitments.

19      143.   This damage – given the reach of the internet – now extends globally.

20      144.   This damage – given the reach of the internet – now extends globally.

21      145.   McKenzie will likely face difficulties in obtaining other employment and

22  entering new ventures as a result of Matkin's and Koller's Statements.

23      146.   Further, Defendants' unlawful conduct, and each of them, as alleged in

24  this Complaint, was and continues to be malicious, fraudulent, despicable, and/or

25  oppressive in that Defendants, and each of them, acted with full knowledge of the

26  consequences to McKenzie as alleged in this Complaint, with the intent to violate

27  McKenzie's rights, and/or with a willful, conscious, wanton, and reckless disregard

28  for McKenzie's rights and for the deleterious consequences and cruel and unjust

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783 5050

49099

hardship resulting to McKenzie  Consequently, McKenzie is entitled to exemplary and punitive damages in an amount to be proven at trial.

## COUNT VIII

## (CIVIL CONSPIRACY TO COMMIT FRAUD AND CONVERSION)

147.   McKenzie repeats and realleges each and every allegation set forth above as if fully set forth in this count.

148.   Defendants entered into a corrupt agreement to deprive McKenzie of funds owed to him.

149.   Coursera had knowledge that The Regents were a fiduciary for McKenzie.

150.   To further the agreement, The Regents falsely entered into a contract by stating it was authorized to sign away all of McKenzie's intellectual property rights and that The Regents had obtained his consent to do so.

151.   The Regents – in furtherance of the agreement – made representations to McKenzie that he continued to retain all intellectual property rights in The Course materials.

152.   Defendants intentionally participated in the furtherance of the plan through phone, telephone, and in person communications where they arranged to obtain, utilize and capitalize on the intellectual property rights rightfully owned by McKenzie.

153.   Coursera actively participated in the civil conspiracy in furtherance of its own individual advantage and financial gain and is thus liable for all damages from the breach of fiduciary duty, conversion, and fraud.

154.   Coursera's actions in engaging in the conspiracy were willful, wanton, oppressive, fraudulent, and malicious.

155.   Based upon the foregoing, McKenzie is entitled to damages from Defendants in an amount to be determined at trial.

156.   Further, Defendants' unlawful conduct, and each of them, as alleged in

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

COMPLAINT FOR DAMAGES

1  this Complaint, was and continues to be malicious, fraudulent, despicable, and/or

2  oppressive in that Defendants, and each of them, acted with full knowledge of the

3  consequences to McKenzie as alleged in this Complaint, with the intent to violate

4  McKenzie's rights, and/or with a willful, conscious, wanton, and reckless disregard

5  for McKenzie's rights and for the deleterious consequences and cruel and unjust

6  hardship resulting to McKenzie  Consequently, McKenzie is entitled to exemplary

7  and punitive damages in an amount to be proven at trial.

8                              **COUNT IX**

9    **(NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC**

10                              **ADVANTAGE)**

11        157.   McKenzie repeats and realleges each and every allegation set forth

12  above as if fully set forth in this count.

13        158.   McKenzie and the students and prospective students for The Course

14  were in an economic relationship that probably would have resulted in an economic

15  benefit to McKenzie, namely purchase of his DVD series and textbook.

16        159.   Similarly, McKenzie, as a Professor Emeritus, would likely engage in

17  additional professional relationships with other universities and/or MOOCs and these

18  relationships would result in an additional economic benefit to McKenzie.

19        160.   Defendants knew or should have known of these relationships.

20        161.   Defendants knew or should have known that these relationships would

21  be disrupted if it/he/she failed to act with reasonable care.

22        162.   Defendants failed to act with reasonable care, engaged in the wrongful

23  conduct identified above and in doing so, disrupted the relationship between

24  McKenzie and the students.

25        163.   Defendants failed to act with reasonable care, engaged in the wrongful

26  conduct identified above and in doing so, disrupted any chance of McKenzie having a

27  professional relationship with another university or MOOC.

28        164.   As a result, McKenzie was harmed and Defendants' wrongful conduct

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

COMPLAINT FOR DAMAGES

49099

1   was a substantial factor in causing McKenzie's harm.

2      165.   Based upon the foregoing, McKenzie is entitled to damages from

3   Defendants in an amount to be determined at trial.

**COUNT X**

**(INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)**

7      166.   McKenzie repeats and realleges each and every allegation set forth

8   above as if fully set forth in this count.

9      167.   McKenzie and the students and prospective students for The Course

10  were in an economic relationship that probably would have resulted in an economic

11  benefit to McKenzie, namely purchase of his DVD series and textbook.

12     168.   Similarly, McKenzie, as a Professor Emeritus, would likely engage in

13  additional professional relationships with other universities and/or MOOCs and these

14  relationships would result in an additional economic benefit to McKenzie.

15     169.   Defendants knew of the relationships.

16     170.   Defendants intended to disrupt the relationships.

17     171.   Defendants engaged in the wrongful conduct identified above and in

18  doing so, disrupted the relationship between McKenzie and the students.

19     172.   Defendants engaged in the wrongful conduct identified above and in

20  doing so, disrupted any chance of McKenzie having a professional relationship with

21  another university or MOOC.

22     173.   As a result, McKenzie was harmed and Defendants' wrongful conduct

23  was a substantial factor in causing McKenzie's harm.

24     174.   Based upon the foregoing, McKenzie is entitled to damages from

25  Defendants in an amount to be determined at trial.

26     175.   Further, Defendants' unlawful, and each of them, as alleged in this

27  Complaint, was and continues to be malicious, fraudulent, despicable, and/or

28  oppressive in that Defendants, and each of them, acted with full knowledge of the

HEWITT *w*CLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

consequences to McKenzie as alleged in this Complaint, with the intent to violate McKenzie's rights, and/or with a willful, conscious, wanton, and reckless disregard for McKenzie's rights and for the deleterious consequences and cruel and unjust hardship resulting to McKenzie  Consequently, McKenzie is entitled to exemplary and punitive damages in an amount to be proven at trial.

**COUNT XI**

**(RETALIATION)**

176.   The Regents failed to protect McKenzie from Matkin's reprisals after McKenzie complained about conversion, fraud, violation of free speech and other conduct that amounted to violations of the University's Standards of Ethical Conduct, Statement of Ethical Values, Faculty Code of Conduct and gross incompetence.

177.   Matkin's abuse and retaliation was intended to drive McKenzie from The Course and silence his criticism concerning the quantity and quality of the coursework in Coursera's MOOCs generally, thus threatening Matkin's lucrative relationship with Coursera.

WHEREFORE, McKenzie requests an Order granting judgment in McKenzie's favor as follows:

A.   Awarding McKenzie all compensatory damages he has suffered, including consequential and incidental damages, as a result of Defendants' wrongful conduct in an amount to be determined at trial.

B.   Awarding McKenzie no less than $230,000.00, plus costs related to his conversion cause of action;

C.   Awarding McKenzie punitive damages in a just amount for Defendants' willful and wanton conduct;

D.   Awarding McKenzie pre-judgment and post-judgment interest;

E.   Awarding McKenzie his costs, expenses and attorney's fees incurred in connection with this action; and

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

1
   F.  Awarding McKenzie such other relief as the Court finds just and

2
    proper.

3
            Respectfully submitted,

4
Dated: February 3, 2014     HEWITT WOLENSKY & McNULTY LLP

5

6

7
        By: _/s/ Hugh Hewitt_

8
          Hugh Hewitt, Esq.

          Elizabeth V. McNulty, Esq.

9
          Kimberly A. Carasso, Esq.

          Attorneys for Plaintiff,

10
          Richard McKenzie

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-5050

49099

COMPLAINT FOR DAMAGES

1

## JURY DEMAND

2    Plaintiff demands a trial by jury on all issues so triable as a matter of right.

3

4                                    Respectfully submitted,

5    Dated: February 3, 2014          HEWITT WOLENSKY & McNULTY LLP

6

7                                    By: */s/ Hugh Hewitt*

8                                         Hugh Hewitt, Esq.
                                          Elizabeth V. McNulty, Esq.
9                                         Kimberly A. Carasso, Esq.
                                          Attorneys for Plaintiff, Richard
10                                        McKenzie

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HEWITT WOLENSKY & McNULTY LLP
4041 MacArthur Blvd., Suite 300
Newport Beach, California 92660
(949) 783-9030

49099

COMPLAINT FOR DAMAGES

# EXHIBIT "1"

# ONLINE COURSE HOSTING AND SERVICES AGREEMENT

This ONLINE COURSE HOSTING AND SERVICES AGREEMENT, dated as of [ ] (the "*Effective Date*"), is by and between Coursera, Inc., a Delaware corporation, with a principal place of business at 1975 W. El Camino Real, Suite 202, Mountain View, CA 94040 ("*Company*") and The Regents of the University of California a California constitutional corporation, on behalf of University Extension at the University of California, Irvine, located at Pereira Drive, west of East Peltason ("*University*"). Each of Company and University may hereinafter be referred to as a "*Party*," and collectively, the "*Parties*."

## BACKGROUND

WHEREAS, Company has developed a proprietary platform to host certain learning content that will be made available to end users online via the Internet;

WHEREAS, University desires to implement Company's proprietary platform by supporting course development by its instructors and making online content available for use in connection therewith by end users ("*End Users*"); and

WHEREAS, Company may make available various forms of services through or in connection with its proprietary platform, and University desires to obtain the services described in this Agreement, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the sufficiency of which are hereby acknowledged, Company and University hereby agree as follows:

## AGREEMENT

1.     **DEFINITIONS.**  Capitalized terms used in this Agreement will have the meaning provided in this Section 1 or as otherwise provided where such terms are first used.

1.1   "*ADA Compliance Protocol*" means the protocols relating to the Americans with Disabilities Act ("*ADA*") setting forth the Parties' responsibilities for providing accommodations to End Users with disabilities with respect to University Courses offered through the Platform, as set forth in Exhibit F, attached hereto.

1.2   "*Agreement*" means this Online Course Hosting and Services Agreement and all Exhibits and Schedules attached hereto.

1.3   "*Company Website*" means the website owned or controlled by Company that allows for the uploading of Content by University, Instructors or Company through the Platform.

1.4   "*Content*" means any information, data, works of authorship or other materials delivered in text, photographic, audio, visual or audiovisual format, including videos, lectures and course materials and syllabi.

1.5    *"Course"* means the presentation of instructional Content pertaining to a certain body of knowledge.

1.6    *"Course Criteria"* means a rigorously designed Course meeting high academic standards that uses multi-media Content in a coherent, high-production-value presentation (i.e., not just simple lecture capture) to provide the End User opportunities for a rich set of interactions and assessment(s) (whether provided by automatic grading technology or by peer-to-peer interaction activities), resulting in a meaningful learning experience that significantly transcends static content or plain videos.  Such Course may correspond to material represented in a full ten to 15 week class offered by University or may correspond to a shorter module (e.g., two or three weeks) so long as such module provides a meaningful unit of learning to the End User.  Such Course may or may not directly correspond to any class offered by University, provided that it meets the criteria set forth in this paragraph.

1.7    *"Course Development Agreement"* means a document substantially in the form of Exhibit E, attached hereto, which sets forth a description of the Course, the agreed-upon monetization model(s), strategies and related pricing, the applicable criteria or standards for such Course, responsibilities for making accommodations for End Users with disabilities, the Initial Period (as defined in Section 3.4(a)), and such other Course-specific matters as Company, University and Instructors may agree.

1.8    *"Instructor"* means any individual who is on University faculty, a graduate student, teaching assistant or adjunct professor of University, or is otherwise employed or contracted by University to provide instruction to students of University.

1.9    *"Intellectual Property Rights"* means all rights worldwide in, to and under copyrights, copyright registrations and applications, trademarks (including trade dress, service marks and trade names), trademark registrations and applications, domain names, patent, patent applications (including the right to claim priority under applicable international conventions) and all patents issuing thereon, inventions, whether or not patentable, trade secrets, author rights, moral rights, rights in goodwill, and other proprietary rights, as may exist now and hereafter come into existence, and all renewals and extensions thereof.

1.10    *"Net Profits"* means the gross amounts received by a Party for monetization of University's Courses under this Agreement minus all reasonably documented costs, expenses, refunds or discounts incurred or actually provided in making such Courses available through the Platform.

1.11    *"Platform"* means Company's proprietary software platform and algorithms used to host, transmit and make Content available via the Internet and to provide related services and functionalities, including automatic grading or facilitating peer-to-peer interactive activities.

1.12    *"Quality Standards"* has the meaning provided in Section 3.4(c).

1.13    *"Registered Students"* means students who are currently enrolled at, and registered to take Courses offered by, University, including both on-site students and distance learning students enrolled for University credit, provided that the number of distance learning students does not exceed the number of on-site students.

1.14    *"Services"* means, collectively, the services provided by Company under the Coursera Monetization Model, University Monetization Model and Registered Student Model.

1.15    *"Term"* has the meaning provided in Section 17.1.

## 2.    SERVICE/REVENUE MODELS FOR ONLINE COURSES

2.1    Content Services and Revenue Models. Company shall offer to University three service/revenue models to provide Content through the Platform, which will be hosted by Company on the Company Website. Each of these models is described in subsections (a) through (c) below. University may elect the appropriate model for each Course on a per-Course basis, at the same time as the Parties agree on the Content to be offered, and with what Course Lifespan, as specified in Section 3.4(b) below. Such election may be changed by University during the Term in accordance with Section 3.4(b) below.

(a)    **Coursera Monetization Model.**    Under the Coursera Monetization Model, University (through its Instructors) may develop, produce and submit Courses to Company, and Company will host and make any such Courses available through the Platform on the main portion of the Company Website, at no cost to University, provided that such Courses fully satisfy the Course Criteria and Quality Standards. University will be responsible for providing Company the Content in a format that can be hosted and streamed via the Platform. Company reserves the right to remove or otherwise suspend access to any Courses failing to satisfy the Course Criteria, at Company's reasonable discretion, with at least three business days prior notice. As between Company and University, Company will be responsible for monetizing and otherwise generating revenue from the offering of such Courses through the Platform and collecting such revenue. All such revenue collected by Company will be shared between Company and University as set forth in Section 5.1. University shall be responsible for any further sharing of any such sums received by University with Instructors or other third parties pursuant to University's agreements with such third parties. Company may pursue any monetization models under the Coursera Monetization Model, subject to University's approval as reflected in a Course Development Agreement, as described in Section 3.4(a). Potential Company monetization models are provided in Schedule 1, attached hereto, by way of example and not limitation. University agrees and acknowledges that the set of Courses agreed under the Coursera Monetization Model shall include a reasonable percentage with a viable monetization strategy. The pricing methodology and price ranges to be charged for each of any Company products and services offered under monetization strategies agreed upon by Company and University under the Coursera Monetization Model shall be specified in a Course Development Agreement for each Course.

(b)    **University Monetization Model.** Under the University Monetization Model, University (through its Instructors) will develop, produce and submit Courses, and Company will host and make such Courses available through the Platform. University will be responsible for providing Company the Content in a format that can be hosted and streamed via the Platform, and such Content, while not required to satisfy Course Criteria in order to be made available on the Platform, must satisfy the Quality Standards. At Company's sole discretion, Company may make such Content that it reasonably determines not to satisfy fully the Quality Standards or the Course Criteria available on a separate page on the Company Website that is

different than the main portion of such website. As between University and Company, University will be responsible for monetizing and otherwise generating revenue from the offering of such Courses through the Platform and collecting such revenue. All such revenue collected by University will be shared between Company and University as set forth in Section 5.2. In addition, by mutual consent, Company may provide additional monetization opportunities, in which case all revenue collected by either Party under any such opportunity will be shared with the other Party as set forth in Section 5.2, as applicable.

       (c)   **Registered Students Model.** Under the Registered Students Model, Company will make Content corresponding to any course offered by University available to Registered Students through the Platform at no charge. University may make such Courses available through the Platform only to Registered Students, using standard protocols for student authentication. University will be responsible for providing Company the Content in a format that can be hosted and streamed via the Platform in accordance with the Quality Standards. If any Course offered under the Registered Students Model is determined not to meet the Quality Standards, Company may decline to offer such Course through the Platform, subject to the procedures applicable to Quality Standards set forth in Section 3.4(c).

3.     **RIGHTS AND OBLIGATIONS OF THE PARTIES WITH RESPECT TO ONLINE COURSES**

     3.1    Platform and Support. Company will provide University with Application Programming Interfaces ("*APIs*") to enable University to connect with the Platform and will host the Platform and associated Content and stream such Content to end users. Company will also provide University with technical support in connection with its use of the Platform and APIs.

     3.2    Course Design and Development. Each of the Parties will perform the obligations, tasks and responsibilities assigned to such Party in Exhibit A with respect to the design and development of Courses for the Platform.

     3.3    Company Website. The Company Website will allow for the uploading of Course Content by University or Instructors via interfaces and authoring tools. The Company Website will be configured so that during the Course Lifespan (defined in Section 3.4(b) below) Instructors may customize, update or adapt Courses provided through the Platform, subject to guidelines provided by Company.

     3.4    Course Offerings.

       (a)   **Course Development Agreement.** Prior to any Course offering, Company and University will mutually agree on and execute a Course Development Agreement, pursuant to which University will offer the applicable Course through the Platform. The expected Content of the Course Development Agreement is specified in Exhibit E. Should University in the process of preparing the Course, decide to make material changes to the agreed upon Course specifications, Company must be notified promptly, and no fewer than 30 days prior to the first scheduled launch of the Course on the Platform.

       (b)   **Course Lifespan.** Prior to any Course offering, the Parties will mutually agree on an initial period for a guaranteed offering of a Course ("*Initial Period*"), as set forth in

the Course Development Agreement. The Course will continue to be offered following the Initial Period, and after the Initial Period University may request that the Course be removed from the Platform (**"Removal Request"**), and within 90 business days (or as otherwise agreed to by the Parties in a Course Development Agreement) of receipt of the Removal Request, Company will remove the Course from the Platform. For purposes of this Agreement, **"Course Lifespan"** means the later of (i) the time until the end of the Initial Period or (ii) the date the Course has been removed from the Platform pursuant to any Removal Request. At the end of the Course Lifespan, University has the right to request that such Course be removed from the Company Website or moved from the Coursera Monetization Model to the University Monetization Model.

(c)     **Course Acceptance Procedures.** Upon upload of the Course Content onto the Platform, Company has the right to check the materials for compliance with the Course Development Agreement, Course Criteria and for reasonable technical quality standards (**"Quality Standards"**) relating to such issues as: (i) video quality; (ii) audio quality; and (iii) correct formatting of assessments and other Content. Should Company find that the Content is not compliant with either the Course Development Agreement or the Quality Standards, Company has the right to so notify the University, and return the Content to the University for correction (via a **"Deficiency Notice"**). Such Deficiency Notice must be provided no later than the last of the following: (i) 21 days in advance of the launch of the Course; (ii) a week following the upload of the relevant Content by the Instructor(s) onto the Company Website; or (iii) promptly upon having a relevant issue pointed out by an End User of the Course through an email or forum post read by Company staff. University at its discretion may correct such Course deficiencies after having received the Deficiency Notice and submit a corrected version of the relevant Content at least three days prior to its scheduled launch date, or within a week of receiving the Deficiency Notice, whichever comes later. Should University not resubmit a version of the Content correcting the issues identified in the Deficiency Notice, Company may, at its sole discretion, decline to launch the Content at its scheduled time. If, after resubmission, Company believes in its reasonable discretion that such Course still does not satisfy any criteria set forth in the Course Development Agreement, Company shall send University another Deficiency Notice and may, at its own discretion, decline to launch the Course at its scheduled time, and the Parties will meet and confer regarding any further corrective actions and a possible new launch date. If University reasonably disagrees with any Deficiency Notice, University will promptly inform Company, and Company will promptly submit the relevant Course to University Advisory Board for review. The University Advisory Board will use reasonable efforts to make a prompt determination of the acceptability of the relevant Course. Such determination of the University Advisory Board will be final. If the Course is accepted by the University Advisory Board, Company will launch the relevant Content on its scheduled launch date, or promptly upon the decision of the University Advisory Board. If the Course is rejected by the University Advisory Board for not having met the criteria set forth in the Course Development Agreement, or due to quality issues observed by Company, University may correct the deficiencies and resubmit the Content, so long as Company receives any such resubmitted Content at least two days prior to its scheduled launch date. Any Content resubmitted by University after that time may be delayed, or launched by Company in its sole discretion.

(d)     **Content Pullout.** Except as otherwise provided herein, University may not remove, block or suspend access, or authorize an Instructor to remove, block or suspend

access, to a Course submitted by University during the Course Lifespan without the prior written approval of Company unless the Instructor who provided the Course or University can demonstrate that any material portion of such Course is grossly erroneous or has become out-of-date in ways that cannot be promptly corrected, or that such Course is non-compliant with any applicable law or regulation. Any disputes between Company and University with respect to the grounds for removing, blocking or suspending access to a Course shall be referred to the University Advisory Board (as defined in Section 9.1) for resolution. Notwithstanding the foregoing, Company or the University will have the right to remove, block or suspend access to any University-provided Content should it be subject to an adverse inquiry or claim (e.g., use of copyrighted materials without approval).

        (e)    **Third-Party Claims**. Should either Party receive a written notice from a third party alleging infringement of its Intellectual Property Rights arising from the provision of University-supplied Content through the Platform or be subject to a governmental investigation, that Party will provide the other Party with notice of the alleged infringement claim, and the Content pertaining to such claim may be immediately removed from the Platform. Should it be determined based on further evaluation of such claim that the Content is not infringing, the content may be reinstated.

        3.5    Forums. Company will host a Q&A forum through which End Users can interact with each other and with Instructors to discuss Course materials. For the first offering of a Course, University will make reasonable efforts to monitor the respective forum to ensure that material Course errors or issues are identified and addressed.

        3.6    Analytics and Scores. Company will administer assessments and make available to University certain aggregate analytics regarding End User behavior and performance for University Courses, which will include information on any of the following: End User demographics, module usage, aggregate assessment scores (stratified by demographics) and reviews by demographics.

## 4.    NON-EXCLUSIVITY

        This Agreement forms a non-exclusive relationship between the Parties. Nothing in this Agreement (a) limits Company's right to host, distribute or otherwise make available Content obtained from third parties, including other educational institutions, whether in connection with the Platform or otherwise, or (b) limits University's right to host, distribute or otherwise make available any of its Content through third parties, in each case except as otherwise expressly agreed to in writing by the Parties.

        Company will not enter into any agreements with any faculty members, or other employees of University except through the authorized representatives listed in section 19.5.

## 5.    REVENUE SHARING AND PAYMENT

        5.1    Coursera Monetization Model. Any revenue accruing through the Coursera Monetization Model will be shared by Company with University and paid as set forth in, and in accordance with, Section 1 of Exhibit B and this Section 5.

5.2     Univers Monetization Model.  Any revenue accruing through the University Monetization Model will be shared by University with Company and paid as set forth in, and in accordance with, Section 2 of Exhibit B and this Section 5.

5.3     Reporting and Payment.  Each Party will pay to the other Party the amounts owed under this Agreement in accordance with Exhibit B.

5.4     Records.  During the Term, and for a period of two years thereafter, each Party will maintain complete and accurate books and records pertaining to all amounts due to the other Party under this Agreement in sufficient detail to enable the amounts due to the other Party to be calculated or determined ("*Records*").

5.5     Audit.  Each Party (through itself or its designated auditors) will have the right to conduct at its expense an audit, not more frequently than once every calendar year, for the sole purpose of determining the other Party's compliance with its recording and payment obligations under this Agreement.  Upon at least ten business days written notice from a Party, the other Party agrees to permit during regular business hours such Party (or its designated auditor), who shall be made subject to written obligations of confidentiality at least as protective as those provided in this Agreement, to examine only those Records necessary for verifying the payments due under this Agreement during the applicable audit period, which shall not exceed the preceding eight calendar quarters.  If any amounts due a Party are ultimately determined to have been underpaid, the other Party will pay any such amounts within 30 days after receipt of an invoice for same from the auditing Party.  In the event the audit shows that a Party has underpaid by five percent (5%) or more, then such Party will pay the reasonable costs of such audit.

5.6     Taxes.  Each Party will be responsible for the payment of all federal, state, and local sales, use, value added or other taxes that are levied or imposed on it by reason of the transactions under this Agreement (other than for taxes based on the other Party's income).  If a Party is required to pay any such taxes for which the other Party is responsible, then the taxes will be billed to and paid by such other Party.

6.     **RESERVED**

7.     **LICENSE GRANTS AND INTELLECTUAL PROPERTY**

7.1     Content License.  Subject to the terms and conditions of this Agreement, University grants to Company a non-exclusive, worldwide license to reproduce, distribute, publicly display, and publicly perform, Content provided by University or any of its Instructors for use on the Company Website in connection with the Platform.  With written consent of University Company may enhance, modify, adapt, and translate such Content.  University grants Company the right to enhance, modify, adapt, and translate Content for subtitles, translations, and format changes.

7.2     Platform Use and Restrictions.  Subject to the terms and conditions of this Agreement, University will have the right to access and use the Platform and to upload Content in connection therewith.  University will also have the right to construct or provide additional software of value to a particular Course, and which will connect with the Platform via APIs provided by Company.  University will not, and will not attempt to (a) decompile, disassemble,

reverse engineer or otherwise attempt to derive the source code for the Platform, except and only to the extent applicable law prohibits or restricts reverse engineering restrictions or (b) modify, adapt, alter, or create derivative works of the Platform.

7.3   No Implied Licenses.   Except as otherwise expressly granted in this Agreement, no license or other rights under a Party's Intellectual Property Rights is granted to the other Party, by implication, estoppel or otherwise.

7.4   Ownership of Intellectual Property.

(a)   **Content.**   All right, title and interest in and to Content created by Instructors or University and provided to Company under this Agreement and all Intellectual Property Rights relating thereto will remain with the applicable Instructor and University, except that all right, title and interest in and to enhancements made by Company to the Content in the form of translations, adaptations, captioning, encoding, transcripts or video annotations produced in response to accessibility requests (*"Content Enhancements"*) will be exclusively owned by Company.

(b)   **Platform.**   All right, title and interest in and to the Platform, related documentation, the Company Website and all updates, modifications, enhancements, improvements, upgrades or corrections thereof, including any assessment features added thereto, and all related Intellectual Property Rights will be exclusively owned by Company. Notwithstanding the foregoing, any software, interfaces or assessment features created or developed solely by University or an Instructor, and the Intellectual Property Rights relating thereto, will be solely owned by University or Instructor, as applicable. Company is hereby granted a royalty-free and non-exclusive license to use any such software, interfaces or assessment features for the duration of the applicable Course Lifespan(s) and solely in connection with offering the applicable Course(s) through the Platform.

(c)   **Joint Works.**   Subject to the foregoing Sections 7.4(a) and (b), any Content, software (including APIs and interfaces), technology, trade secrets, works of authorship, inventions (whether patentable or un-patentable) and features and all updates, modifications, enhancements, improvements, upgrades relating thereto and all Intellectual Property Rights therein that are jointly created or developed by the Parties during the Term (*"Joint Works"*) will be jointly and equally owned by the Parties, and each Party will have the unlimited right to freely use such Joint Works without a duty of accounting to, or consent from, the other Party.

7.5   Limitations on Use of Content Enhancements.   In the event Company makes any Content Enhancements for enabling the hosting, streaming, display or presentation of Content via the Platform, University shall not use, and shall not allow its Instructors to use, such Content Enhancements without Company's prior written consent, except for the sole use by University for its Registered Students in connection with the applicable Course offered through the Platform. Any other use of the Content Enhancements by University or its licensees or Instructors will require Company's express prior written consent. Similarly, Company shall not use the Content Enhancements for any purpose not related to the offering of the associated University's Course.

8.    **INSTRUCTOR AGREEMENT**

University will require and cause all of its Instructors or guest presenters providing any Content for use on the Platform, prior to uploading any such Content to the Platform, to execute and deliver to Company, a signed statement from the Instructors and all guest presenters indicating that they have read and understood this Agreement. University will take responsibility for executing an agreement between University and any instructor, course author, guest presenter or participant, or any other person contributing to development of Course which allows University to fulfill its obligations and assert its rights under this Agreement.

9.    **STRUCTURE AND GOVERNANCE**

9.1    Advisory Board. Company will form an academic advisory board comprised of a senior academic official from each of the initial participating institutions ("*University Advisory Board*") with Company being a non-voting member of such advisory board for the purpose of participating in and providing input to discussions. The University Advisory Board will advise Company regarding academic decisions (including the selection and provision of new Content). Inclusion of any new members of the University Advisory Board will require approval of a majority of its current members. Activities and responsibilities of the University Advisory Board are further set forth on Exhibit D, attached hereto.

9.2    Selection of Partner Institutions. Company's partnership with other educational institutions will be set forth on Exhibit D

10.    **COPYRIGHT CLEARANCE**

Copyright Clearance. As between University and Company, University will be responsible for reviewing and obtaining any necessary licenses, waivers or permissions with respect to any third-party rights to Content provided by University or Instructors. To the extent that Company provides any accommodations for the Content, as provided in Section 11.2 below, the Parties acknowledge and agree such accommodations are being provided solely to make such Content accessible to persons who otherwise would not be able to access or use such Content, and are not intended to be modifications to, or derivative works of, any underlying Content.

11.    **ADA COMPLIANCE**

11.1    University Responsibilities. University will be responsible, at its expense, for providing Content that is accessible to End Users with disabilities, including End Users with visual impairments using a screen reader technology, to enable compliance with the applicable laws and regulations of the Americans with Disabilities Act ("*ADA*"). University and its Instructors, as part of the Course preparation, will provide the materials required to be provided by University and its Instructors as provided in the ADA Compliance Protocol, including: (i) copies of any slides used in the video lectures and (ii) text description files for any material images used in quizzes or problem sets. Upon request of an End User with a disability, and as further set forth in the ADA Compliance Protocol, University will, consistent with and to the extent required under applicable laws and regulations pertaining to disability access, use commercially reasonable efforts to provide appropriate accommodations in a reasonable timeframe with respect to the Course and will bear costs associated with such accommodations

during the Course Lifespan. Upon request, Company will provide assistance to University in providing such accommodations, for a fee to be mutually agreed upon. University shall further cooperate with Company with respect to requests for accommodations from End Users with disabilities as further set forth in the ADA Compliance Protocol. If at its sole discretion University determines that the cost associated with accommodations are excessive, it may remove the course from the Company's platform.

11.2  Company Responsibilities. Company will: (i) use commercially reasonable efforts to make the Platform reasonably accessible to End Users with disabilities, (ii) ensure that a text description file is associated with all material images in quizzes or problem sets provided by University or Instructors, (iii) proactively provide captioning for University Courses offered to the public whose initial enrollment is above 10,000 End Users, and provide such captioning for courses whose initial enrollment is smaller, in a timely manner, upon request by an End User with a disability, (iv) provide University with text transcripts of captions to facilitate University's creation of audio captions for visual elements of its Content, to the extent such text transcripts have been created by Company, and (v) provide a capability for collecting and displaying "crowd-sourced" annotations to Content. University will provide assistance to Company as reasonably necessary for Company to fulfill its obligations under this paragraph. Company shall further cooperate with University with respect to requests for accommodations from End Users with disabilities as further set forth in the ADA Compliance Protocol.

12.  NAME USAGE, TRADEMARKS AND PRESS RELEASE

12.1  Name Usage License. Subject to the terms and conditions of this Agreement (including Section 12.2), each Party grants (the "*Granting Party*") to the other Party (the "*Licensing Party*") a non-exclusive, non-assignable (subject to Section 19.9), limited, worldwide license (without right to sublicense) to use the name, brand name, trademarks, service marks and logos designated on Exhibit C attached hereto ("*Marks*") of the Granting Party solely in connection with the offering of Content provided by University via the Platform and the marketing, promotion and advertising thereof, as further set forth on Exhibit C.

12.2  Trademark Usage Guidelines. Each Party will comply with the trademark usage guidelines provided by the Granting Party as of the Effective Date, which the Granting Party may update from time to time, provided that the Licensing Party shall not be required to cease, alter or modify use of the Granting Party's Mark(s) as a result of any such update or subsequent change made to the trademark usage guidelines unless the Parties mutually agree. Subject to the foregoing sentence, the Granting Party will have the right to review the Licensing Party's usage of the Granting Party's Marks and require modifications to such use consistent with the Granting Party's usage guidelines, and at the Granting Party's request, the Licensing Party will correct all uses that do not comply with the Granting Party's guidelines or cease any use of such Marks. The Parties agree that any and all permitted use of the Granting Party's Marks and any goodwill established in connection therewith will inure to the exclusive benefit of the Granting Party, and use of such Marks will be subject to the Granting Party's prior, express authorization and approval, in each instance, provided that once initial approval is obtained by the Licensing Party for such permitted use, the Licensing Party shall not be required to obtain the Granting Party's approval for subsequent uses that are consistent with the prior authorized and approved use even if the Granting Party's trademark usage guidelines have been subsequently updated or changed.

The Marks of the Granting Party are and will remain the sole and exclusive property of the Granting Party.

12.3    Linking Obligation.  University will identify Company and provide a link to the Company Website, consistent with University's policies or guidelines with respect thereto, and as may be further set forth in Exhibit H, attached hereto.

13.    **REPRESENTATION AND WARRANTIES**

13.1    Mutual Representations.  Each Party represents and warrants to the other Party that (a) the execution and delivery of this Agreement has been duly authorized by all necessary action; (b) to its knowledge this Agreement is a legally and valid obligation binding upon it and is enforceable in accordance with its terms, and the execution, delivery and performance will not conflict with any agreement, instrument or understanding to which such Party is bound; and (c) it has the full right and capacity to grant the rights hereunder without violating or conflicting with the rights of any third party.

13.2    Representations by University.  University further represents and warrants to Company that to its knowledge: (a) all Instructors or guest presenters providing any Content for use on the Platform have read and understood this Agreement and have executed an agreement with the University providing University rights consistent with this Agreement and (b) all Courses provided by University for use with the Platform under the Coursera Monetization Model satisfy the Course Criteria.

13.3    Representation by Company.  Company further represents and warrants to University that, to its knowledge, use of the Platform by University or Instructors will not infringe the Intellectual Property Rights of a third party.

14.    **CONFIDENTIALITY; END USER DATA**

14.1    Confidential Information.  During the performance of their obligations under this Agreement and for five (5) years after the termination of the Agreement, the Parties may exchange or obtain confidential and proprietary information of the other Party.  For purposes of this Agreement, the Party disclosing Confidential Information is hereinafter referred to as the "*Disclosing Party*" and the Party receiving Confidential Information hereunder is hereinafter referred to as "*Recipient*." "*Confidential Information*" means only non-public information relating to the business or affairs of a Disclosing Party that is disclosed to a Designated Agent of the Recipient in writing, marked "Confidential" or with a similar legend.  Confidential Information will not include: (i) information that is in the public domain before the Effective Date or becomes generally available to the public other than as a result of disclosure by the Recipient, (ii) information available to the Recipient on a non-confidential basis before receipt from the Disclosing Party, (iii) information received by the Recipient from a third party who is under no obligation to keep the information confidential; or (iv) information developed independently by the Recipient, without using or referring to the Disclosing Party's Confidential Information, as evidenced by Recipient's written records.

14.2    Permitted Use.  Each Party will use the other Party's Confidential Information solely to carry out its obligations under this Agreement and for no other purpose.  Neither Party

has or will obtain any other rights or interest in the other Party's Confidential Information by virtue of disclosure hereunder.

14.3   <u>Non-Disclosure</u>. Except as otherwise required by law, Recipient agrees not to disclose the Confidential Information of the Disclosing Party to any third parties or to any of its employees or independent contractors except those employees and independent contractors who have a need to know the Confidential Information in order for the Recipient to perform its obligations hereunder and where such employees will be made aware that the information is confidential.   The Recipient agrees to use the same care and discretion to avoid disclosure, publication or dissemination of the Disclosing Party's Confidential Information that the Recipient uses to protect its own Confidential Information, but in no case will Recipient use less than reasonable care to protect the Disclosing Party's Confidential Information.   Either Party may disclose the existence and terms of this Agreement to its advisors, counsel, actual or potential financing sources or acquirers, and to senior administration officials at other educational facilities, in each case under written obligations of confidentiality.

14.4   <u>Return</u>.   A Disclosing Party may at any time notify the Recipient that the Recipient must return to the Disclosing Party the Disclosing Party's Confidential Information. Each Party hereby agrees to, within 30 days of the notification:  (i) return all documents and tangible items it or its employees or agents have received or created pursuant to this Agreement pertaining, referring or relating to the other Party's Confidential Information and (ii) return or certify in a writing attested to by a duly authorized officer of such Party that it has destroyed all copies thereof.

14.5   <u>Disclosures Required By Law</u>. Where disclosure of the Confidential Information is required by operation of law, court order or governmental order, the Recipient will immediately notify the Disclosing Party thereof (including the manner of disclosure) so that the Disclosing Party may take such action as it deems necessary to intervene, limit the scope of disclosure or otherwise seek assurances of confidentiality. .

14.6   <u>Student Information and Communications</u>.   End Users' use of the Platform and Company's use of End User information will be subject to the Coursera privacy policy provided on the Company Website.

(a)   **Coursera Monetization Model**.   Company will not disclose any End User data collected in connection with Courses offered under the Coursera Monetization Model to University or any third party without the End User's express permission.   University will not sell, provide or otherwise disclose any End User data collected in connection with Courses offered under the Coursera Monetization Model, including e-mail addresses and other contact information, to any third party without the End User's express permission.   University agrees that it will use End User e-mails only to deliver communications or advertisements that are of a quantity and quality that are commensurate with University's high standards and do not impose an unreasonable intrusion on any End Users' time or resources only for (i) the purpose of Course-based administrative communications or (ii) University-sponsored activities.  University and Company will provide End Users the option to opt out of different forms of e-mail communications from Company and University, as applicable, provided that Company may continue to deliver administrative communications relating to University Courses to End Users.

If agreed as a monetization strategy for the applicable Course, End Users will also be provided the option to opt in or opt out of receiving offers or other communications from prospective employers.

(b)   **University Monetization Model.** With End User consent, Company will provide University access to End User names and e-mail addresses and per-End User assessment results collected in connection with Courses offered under the University Monetization Model in a grade book format, provided that University agrees not to sell, provide or otherwise disclose any such data to any third party without the End User's express permission. University will not use such End User e-mails or other contact information, or allow third parties to whom it has provided such information to use, in a manner that would reflect negatively on the Services or the Company Website. University agrees that it will use such End User e-mails or other contact information only to deliver communications or advertisements that are of a quantity and quality that are commensurate with University's high standards and do not impose an unreasonable intrusion on any End Users' time or resources only for (i) the purpose Course-based administrative communications or (ii) University-sponsored activities. University will provide a mechanism to allow End Users receiving communications via such e-mail or other contact information to opt out of such University communications. Except with the prior consent of University, Company will not contact End Users enrolled in Courses subject to the University Monetization Model (other than regarding administrative matters such as site maintenance), nor will it authorize third parties to contact such End Users via the Company Website except for administrative communications sent to End Users relating to University Courses.

(c)   **Registered Students Model.** Company will provide University per-End User assessment results collected in connection with Courses offered under the Registered Students Model in a grade book format. Company will treat as all data on End User identity and End User performance for Registered Students as the Confidential Information of University, and will not disclose this information to any third party without permission from University, except as expressly permitted in this <u>Section 14</u>. Except with the prior consent of University, Company will not contact End Users enrolled in Courses subject to the Registered Student Model (other than regarding administrative matters such as site maintenance), nor will it authorize third parties to contact such End Users via the Company Website.

## 15.   DISCLAIMERS; LIMITATIONS ON LIABILITY

15.1   <u>DISCLAIMER OF WARRANTY</u>. THE SERVICES AND THE PLATFORM ARE PROVIDED BY COMPANY "AS IS" WITHOUT ANY WARRANTY OF ANY KIND, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.

15.2   <u>DISCLAIMER OF CONSEQUENTIAL DAMAGES</u>. EXCEPT FOR DAMAGES OR LIABILITY ARISING FROM A BREACH OF A PARTY'S CONFIDENTIALITY OBLIGATIONS UNDER THIS AGREEMENT OR A PARTY'S WILLFUL MISCONDUCT, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES (INCLUDING DAMAGES FOR LOSS OF BUSINESS OR INFORMATION OR

BUSINESS INTERRUPTION) ARISING OUT OF THIS AGREEMENT OR ARISING FROM OR RELATING TO THE PLATFORM, REGARDLESS OF WHETHER SUCH LIABILITY IS BASED ON BREACH OF CONTRACT, TORT, STRICT LIABILITY, BREACH OF WARRANTIES OR OTHERWISE, AND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS EXCLUSION AND LIMITATION SHALL APPLY EVEN IF ANY REMEDY FAILS OF ITS ESSENTIAL PURPOSE.

15.3   LIMITATION ON LIABILITY.   EXCEPT FOR DAMAGES OR LIABILITY ARISING FROM A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, A PARTY'S TOTAL AGGREGATE LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF THE FORM OF THE CAUSE OF ACTION, WHETHER IN CONTRACT, TORT, STATUTE OR OTHERWISE, SHALL IN NO EVENT EXCEED THE TOTAL AMOUNT OF NET PROFITS SUCH PARTY RECEIVED IN CONNECTION WITH THE MONETIZATION OF UNIVERSITY COURSES UNDER THIS AGREEMENT IN THE TWELVE MONTHS PRECEDING THE DATE ON WHICH THE CLAIM FOR DAMAGES OR LIABILITY AROSE.

16.   **INDEMNIFICATION**

16.1   Indemnification by University.   The University, shall defend, indemnify and hold harmless Company, its officers, employees, and agents from and against any and all liability, loss, expense (including reasonable attorneys' fees), or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of the University, its officers, employees, or agents.

16.2   Indemnification by Company.   Company, shall defend, indemnify and hold harmless the University, its officers, employees, and agents from and against any and all liability, loss, expense (including reasonable attorneys' fees), or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Company, its officers, employees, agents, or subcontractors.

16.3   Neither termination of this Agreement nor completion of the acts to be performed under this Agreement shall release any party from its obligation to indemnify as to any claims or cause of action asserted so long as the event(s) upon which such claim or cause of action is predicated shall have occurred prior to the effective date of termination or completion

16.4   Procedures.   Each Party's right to indemnification under this Section 16 is conditioned on the Party seeking indemnification ("*Indemnified Party*") (a) giving prompt written notice of, and tendering any such claim to, the other Party ("*Indemnifying Party*"); (b) permitting the Indemnifying Party to solely defend or settle any such claim at its sole expense; provided, however, that (i) the Indemnifying Party will not enter into any settlement agreement that would result in any admission by the Indemnified Party or payment by the Indemnified Party without the Indemnified Party's prior written consent, and (ii) the Indemnified Party may at its election participate in the defense of such claims through separate counsel at its own expense;

and (c) providing the Indemnifying Party all reasonable assistance (at the expense of the Indemnified Party) in connection with the defense or settlement of any such claims.

17.   **TERM AND TERMINATION**

17.1   Term.  This Agreement will commence on the Effective Date and will continue in effect until terminated as set forth below (the "*Term*").

17.2   Termination for Cause.  Either Party may terminate this Agreement, upon written notice to the other Party: (a) if such other Party commits a material breach of this Agreement, which breach is not cured within 30 days of receipt of written notice of such breach from the non-breaching Party, (b) immediately if such other Party has a receiver appointed, or an assignee for the benefit of creditors or in the event of any insolvency or inability to pay debts as they become due, except as may be prohibited by applicable bankruptcy laws, or (c) immediately if the acts or omissions of such other Party adversely or negatively cause or result in material damage to or loss of a Party's reputation.  Any disagreements or disputes regarding any material damage or loss to reputation will be resolved by the dispute resolution procedures set forth in Section 19.2.

17.3   Termination without Cause.  Either Party may terminate this Agreement upon providing at least 90 days' prior written notice of such termination to the other Party.

17.4   Consequences of Termination.  Termination of this Agreement for any reason does not relieve either Party of its obligation to pay any amounts owed to the other Party that became due prior to such termination.  Upon any termination of this Agreement, each Party will promptly return all Confidential Information (other than this Agreement) of the other Party in its possession or control.

(a)   In the event of termination of this Agreement by either Party, all rights and obligations under this Agreement will immediately cease, and Company will have no further obligation to provide any of the Services, except that in the case of termination by either Party under Section 17.3 or termination by University under Section 17.2 (and provided Company does not itself have a right to terminate this Agreement under Section 17.2), Company will continue to host and make available, and have the right to monetize, any Course that is being hosted and provided by Company through the Platform at the time of termination for the remainder of the Course Lifespan.

(b)   Notwithstanding anything to the contrary in this Section 17.4, in the event of termination of this Agreement by University under Sections 17.2(a) and 17.2(c), Company agrees that for a period of up to three years after such termination, and at University's request, it will continue providing hosting and streaming services through the Platform under the University Monetization Model, subject to all applicable terms and conditions of this Agreement (including payment by University), which terms and conditions will survive so long as Company continues to provide such services post-termination.

17.5   Surviving Provisions.  The following provisions will survive any expiration or termination of this Agreement: Sections 1; 5.1 – 5.3 (for owing and unpaid amounts), 5.4 – 5.6; 7.4; 14; 15; 16; 17.4; 17.5 and 19.

18.   **SOURCE CODE ESCROW**

18.1   <u>Deposit</u>. Within 30 days of University's request, Company will place a complete copy of the source code for the Platform and related documentation (including instructions for use) into escrow with an independent third-party escrow agent mutually agreed by the Parties, at University's expense, and enter into an escrow agreement under which University is a named beneficiary ("*Escrow Agreement*"). Throughout the Term, Company will update the source code for the Platform and related documentation every calendar quarter so that the deposit reflects the most current version of the Platform and documentation (collectively, the "*Escrow Materials*").

18.2   <u>Release</u>. Provided that University is not in breach of this Agreement, University will be entitled to request the release of the Escrow Materials upon the occurrence of one of the following events (each being a *"Release Event"*): (i) Company becomes the subject of any proceedings seeking relief, reorganization or rearrangement under any laws relating to bankruptcy or insolvency (and such proceeding is not dismissed within 90 days) and Company becomes unable to perform its obligations with respect to the Platform under the terms and conditions of this Agreement; or (ii) Company commences the liquidation, dissolution or winding up of its business and no successor-in-interest to Company continues to operation the business. If this Agreement is terminated by Company pursuant to <u>Section 17.2</u>, then University's rights as a beneficiary under the Escrow Agreement will immediately terminate.

18.3   <u>Rights to Escrow Materials</u>. If the Escrow Materials are released to University pursuant to a valid Release Event, then Company hereby grants University a non-exclusive, non-transferable right and license to use the Escrow Materials internally for the sole purpose of hosting and offering Content to End Users in accordance with the terms and conditions of this Agreement, for the remainder of the Term, and to use and modify the Escrow Materials for internal support and maintenance purposes. The Escrow Material at all times remains the Confidential Information of Company, and will be protected in perpetuity until and unless one or more of the confidentiality exclusions set forth in <u>Section 14.1</u> above occurs. University will not have the right to distribute, publish or otherwise disclose any of the Escrow Materials. If, following the release to University of the Escrow Materials, Company can demonstrate to University's reasonable satisfaction that Company can continue to perform its obligations under this Agreement, then University will return the Escrow Materials to the escrow agent and cease exercising its license rights in this <u>Section 19.3</u>.

19.   **GENERAL TERMS**

19.1   <u>Governing Law and Venue</u>. This Agreement will be deemed to have been executed and delivered in the State of California, and will be governed by, and construed and enforced in accordance with, the laws of the State of California, without regard to its conflict of law principles. Each Party hereby expressly consents to the jurisdiction and venue of any federal or state court in California.

19.2    Dispute Resolution.

(a)    In the event that any dispute, claim or controversy (collectively, a *"Dispute"*) arises out of or relates to any provision of this Agreement or the breach, performance or validity or invalidity thereof, an appropriate authorized manager of each Party will attempt a good faith resolution of such Dispute within 30 days after either Party notifies the other of such Dispute. Neither University nor Company may pursue any Dispute except as set forth below in this Section 19.2.

(b)    If such Dispute is not resolved within 30 days after such notification, the Parties shall, upon demand by either Party, within ten business days thereafter (or such longer time agreed to by both Parties), agree upon and retain (with expenses to be borne equally by the Parties) a neutral individual to act as a mediator. If the Parties cannot agree upon a mediator within the time period, the selection shall be made by the American Arbitration Association upon the request of either Party, with the administrative costs for such selection to be borne equally by the Parties. The mediation shall be conducted within 60 days of the appointment of the mediator (unless the Parties agree to a later date), and shall be conducted confidentially in an effort to settle the Dispute. Nothing herein, however, will prohibit either Party from seeking temporary injunctive relief from any court of competent jurisdiction.

(c)    If the Dispute is not settled within ten business days after the first day of mediation (or such longer time agreed to by both Parties), either Party may initiate litigation only in California, and neither Party may litigate in any other forum; however, neither Party may initiate litigation against the other without first utilizing the process set forth in this Section 19.2, except for seeking a temporary restraining order or a preliminary injunction. To the extent permitted by law, the Parties agree that any statute of limitations applicable to any claim, controversy, or dispute shall be tolled from the date that such notice is sent under clause (a) above until the first day upon which the Parties are permitted to initiate litigation. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY DISPUTE DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT.

19.3    Independent Contractors. The relationship between Company and University under this Agreement is that of independent contractors. Nothing in this Agreement will be construed so as to constitute Company and University as partners or joint venturers, or either Party as the employee or agent of the other Party, or in any other manner other than as independent contractors. Neither Party will have any power or authority to bind the other Party in any transaction with a third party.

19.4    Headings and Construction. The headings are provided for convenience only and will not be used in interpreting any provision of this Agreement. No rule of strict construction shall apply to or be used against either Party as a consequence of such Party's authorship of any provision of this Agreement. As used in this Agreement, the words "include," "including" and their variants are to be construed as if followed by the words "without limitation" or "but not limited to."

19.5   Notices.  Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and delivered personally or sent by Federal Express, or registered or certified mail, postage prepaid, addressed as follows:

<table>
<tr><td>If to Company, at:</td><td>Coursera, Inc.<br>Attn: Daphne Koller<br>1975 W. El Camino Real, Suite 202<br>Mountain View, CA 94040<br>Phone: 650-386-5525</td></tr>
<tr><td>If to University, at:</td><td>University of California, Irvine Extension<br>PO Box 6050<br>Irvine, CA  92616-6050<br>Attn: Dean Gary Matkin<br><br>AND<br><br>University of California, Irvine<br>Materiel & Risk Management<br>250 PSB<br>Irvine, CA  92697<br>Attn: Director of Materiel & Risk Management</td></tr>
</table>

19.6   Force Majeure.  Each Party is excused from performance of this Agreement (other than for any payments due) and will not be liable for any delay in whole or in part caused by the occurrence of any contingency beyond the reasonable control of such Party.  These contingencies include, without limitation, war, sabotage, insurrection, riot or other act of civil disobedience, act of public enemy, failure or delay in transportation, act of government or any agency or subdivision thereof affecting the terms of this Agreement or otherwise, judicial action, labor dispute, student disorders, accident, fire, explosion, flood, severe weather, natural disaster or other act of God, shortage of labor, hardware failure, interruptions or failure of the Internet or third-party network connections or incapacity of an Instructor.

19.7   Entire Agreement; No Third-Party Beneficiaries.  This Agreement, including all Exhibits and Schedules attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter of this Agreement,. Nothing in this Agreement is intended or shall be construed to entitle any person or entity other than the Parties and their respective transferees and assigns permitted hereby to any claim, cause of action, remedy or right of any kind.

19.8   Amendment.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, will be valid or binding unless set forth in a writing signed by both Parties.

19.9   Assignment. Neither Party may assign this Agreement without the prior written consent of the other Party, which will not be unreasonably withheld, except that either Party may assign this agreement without consent in connection with a merger, consolidation, restructuring or sale of all or substantially all of its equity or business or assets to which this Agreement relates. Subject to the foregoing, this Agreement will inure for the benefit of each of the Party's permitted successor and assigns.

19.10   Expenses. Except for costs and expenses specifically assumed by a Party under this Agreement or imposed upon a Party pursuant to another provision of this Agreement, each Party will pay its own expenses incident to this Agreement.

19.11   Severability. If any provision of this Agreement, or portion thereof, is held by a court of competent jurisdiction to be contrary to law or otherwise unenforceable, the provision will be modified by the court and interpreted so as best to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement will remain in full force and effect.

19.12   Waiver. Neither the waiver by any of the parties of a breach of or a default under any of the provisions of this Agreement, nor the failure of any of the parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder will thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

19.13   Attorneys' Fees. The prevailing Party in any suit, action, counterclaim, or arbitration arising out of this Agreement will be entitled to recover reasonable attorneys' fees, litigation expenses, collection costs, and the cost of any arbitration in addition to court costs.

19.14   Compliance with Laws. Each Party will comply with all federal, state and local laws and regulations, as amended from time to time, applicable to such Party's performance of its obligations under this Agreement, including all applicable export laws and regulations of the United States and other applicable jurisdictions.

19.15   Counterparts. This Agreement may be executed in one or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Party.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

Coursera, Inc.                          Regents of the University of California
"Company"                               "University"


By: _____            By: _____
                                        Gary Matkin, Dean
Printed Name: _____           Continuing Education, Distance Learning, and
                                        Summer Session
Title: _____


                                        By: _____  9/17/12
                                        Rick Coulon, Interim Director
                                        Materiel & Risk Management

**Exhibit A**
**Design and Development Obligations with Respect to Online Courses**

| Task | University | | | Company | | |
|---|---|---|---|---|---|---|
| **University** | | | | | | |
| 1. Company will assist in training TAs and in guiding faculty. At its discretion, Company may send course support personnel to University site at the beginning of quarters or semesters. | | | | ☒ | ☒ | ☒ |
| 2. Company will provide phone and email support for course staff throughout the content production process. | | | | ☒ | ☒ | |
| 3. University will appoint a local representative to assist faculty as needed. Representative will be part-time or full-time, as appropriate. | ☒ | | | | | |
| 4. University will encourage, but not require, its faculty to participate in delivering Company Course Content, provided that such activities do not materially detract from and are consistent with the academic priorities of University. | ☒ | ☒ | | | | |
| 5. University will use reasonable efforts to support online Course development for the Platform, including, at its discretion, such actions as: recording lectures in classrooms, with Instructor's consent and in accordance with applicable law and University policy; supporting town-hall meetings where Company can present the platform to faculty; purchasing equipment and setting up | ☒ | | | | | |

| Task | University | | | Company | | |
|---|---|---|---|---|---|---|
| | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ |
| recording studios; and providing TAs to Instructors to support Course development. | | | | | | |
| ▓▓▓▓▓▓▓▓▓▓ | | | | | | |
| 1. Company will provide suggested guidelines for setups of recording infrastructure; Company will also provide suggested guidelines for the recording process. | | | | ☒ | ☒ | ☒ |
| 2. University will purchase appropriate video production hardware and software and find and provide space for recording studios, as needed. | ☒ | | | | | |
| 3. University teaching staff will deliver lectures in an appropriate recording environment (whether a classroom, a recording studio, an office, or elsewhere). | ☒ | | | | | |
| 4. University will edit and segment (chunk) video Content (through TAs or other University staff, working under Instructor's supervision). | ☒ | | | | | |
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | | | | | | |
| 1. Company will provide Instructors with a set of convenient authoring tools for the construction of auto-graded assessments in a set of standard formats, e.g., multiple choice, check boxes, short answer. | | | | ☒ | ☒ | ☒ |
| 2. University will design scalable forms of assessments and other types of interaction for their respective Courses. | ☒ | | | | | |
| 3. Company, at its discretion, will develop infrastructure for additional forms of | | | | ☒ | ☒ | ☒ |

| | University | | | Company | | |
|---|---|---|---|---|---|---|
| **Task** | | | | | | |
| assessments required for particular Courses, as supported by the Platform. | | | | | | |
| 4. Instructors may optionally develop additional forms of assessment specialized to their Courses, which interfaces with the Platform via APIs provided by Company. | ☒ | ☒ | ☒ | | | |
| Company will (working with University and other partner institutions) help to develop best practices for online instruction and for use of classroom time when moving to a flipped classroom model.  Such guidelines and resources will be provided to Instructors in an easy-to-use format. | | | | ☒ | ☒ | ☒ |
| Company will work with University and other partner institutions to develop blanket IP usage agreements with publishers of major sources of Content, in return for acknowledgments on the Company Website. | ☒ | | | ☒ | ☒ | |
| 1. Company will design the Platform so that it is accessible to screen reading technology. | | | | ☒ | ☒ | ☒ |
| 2. University will reasonably assist Company in addressing accessibility for visually impaired End Users by providing a copy of slides corresponding to the Courses uploaded to the Platform and causing Instructors to provide text descriptions for graphic content included in any form of End User assessments. | ☒ | ☒ | | | | |

| | Responsible Party | | | | | |
|---|---|---|---|---|---|---|
| | University | | | Company | | |
| Task | Captioning/ Translation Model | University Monetization Model | [Illegible] | Coursera Monetization Model | [Illegible] | [Illegible] |
| 3. For low-enrollment Courses under the Coursera Monetization Model, for which captions are not immediately generated, Company agrees to provide captioning promptly upon request by a hearing-impaired End User, pursuant to Section 11.1(a). | | | | ☒ | | |
| **[Section header]** | | | | | | |
| 1. The Platform will fully support captioning in English (and other languages) of video content, to ensure accessibility for hearing-impaired End Users, to make the material more accessible to foreign-language speakers, and to allow text-based indexing into video stream. | | | | ☒ | ☒ | ☒ |
| 2. Company will provide captioning for Courses offered to the public whose initial enrollment is above 10,000. | | | | ☒ | | |
| 3. Company will, within the first three months of the term provide capabilities to crowd-source captioning. | | | | ☒ | ☒ | |
| 4. Company will, within the first three months of the Term, provide capabilities to crowd-source translations into multiple languages. | | | | ☒ | ☒ | |
| **[Section header]** | | | | | | |
| 1. Company will provide University with Application Programming Interfaces ("APIs") to enable University to connect with the Platform and will host the Platform and associated Content and stream such Content to end users. Company will also | | | | ☒ | ☒ | ☒ |

| Task | University | | | Company | | |
|------|------------|---|---|---------|---|---|
| | | | | | | |
| provide University with technical support in connection with its use of the Platform and APIs. | | | | | | |
| 2. Company will host the Platform and associated Content and stream such Content to end users. | | | | ☒ | ☒ | ☒ |
| 3. Company will provide University with technical support in connection with its use of the Platform and APIs. | | | | ☒ | ☒ | ☒ |
| 4. Company will host a Q&A forum through which End Users can interact with each other and with Instructors to discuss Course materials. | | | | ☒ | ☒ | ☒ |
| 5. For the first offering of a Course, University will cause each Instructor to monitor his or her respective forum to ensure that material Course errors or issues are identified and addressed. | ☒ | ☒ | | | | |
| 6. Company will administer assessments and make available to University certain aggregate analytics regarding End User behavior and performance, which will include information on any of the following: End User demographics, module usage, aggregate assessment scores (stratified by demographics) and reviews by demographics. | | | | ☒ | ☒ | ☒ |
| 7. Upon request of an End User with a disability, commercially reasonable efforts | | ☒ | ☒ | ☒ | | |

OMM_US:70645144.2

25

| Task | University | | Company | |
|------|------------|---|---------|---|
| will be used to provide appropriate accommodations in a reasonable timeframe | | | | |

26

**Exhibit B**
**Revenue Sharing**

1.  **Coursera Monetization Model**

As between Company and University, revenues from any monetization strategies used under the Coursera Monetization Model will be shared as follows:

- Company will pay to University six to fifteen percent (6 - 15%) of gross revenues received by Company for Courses offered through the Platform (the *"Revenue Share"*).
- The applicable percentage of the Revenue Share will be determined by the Parties in the applicable Course Development Agreement on a per-Course, sliding scale basis, depending on the quality of materials provided by University and on the agreed upon length of the Initial Period. By way of example:
    - Company will pay University six percent (6%) of gross revenues for Courses with minimal production value (as reasonably determined by Company, subject to review by the University Advisory Board for any disagreements by University relating to such determination) or a Course with a three-month Course Lifespan.
    - Company will pay University fifteen percent (15%) of gross revenues for Courses provided as edited, chunked videos with high production value and meaningful assessments (as reasonably determined by Company, subject to review by the University Advisory Board for any disagreements by University relating to such determination) and a 36-month Initial Period.
        - In addition to the duration of the Course as provided above, for each Course offered under the Coursera Monetization Model, Company will also take into account the number and quality of assessments offered for each such Course in determining the applicable percentage of gross revenues such that the percentages identified above may be adjusted up or down at Company's reasonable discretion.
        - Upon request by University, Company may, at its sole discretion, provide for a higher percentage of Revenue Share for Courses of short Course Lifespan whose topic is such that a shorter Course Lifespan is warranted.
    - At the request by University, Company may provide, for an agreed upon fee, Content preparation services, such as chunking, video editing or help in preparing assessments. The Parties agree that any such services provided by Company do not constitute part of this Agreement but will be provided to University under a separate agreement by Company as a service provider to University.
- In addition, Company will pay University twenty percent (20%) of Gross Profits on the aggregate set of Courses provided by University or Instructors under this Agreement (*"Additional Revenue Share"*). Calculation of Gross Profits will account for deduction of all costs specific to University Courses, including, but not limited to,

any previous Revenue Share paid to University by Company, costs of captioning and translation of University Courses, hosting and website charges, costs for tutoring and grading, etc. for University Courses.

**2.    University Monetization Model**

To be determined on a Course-by-Course basis and set forth in the applicable Course Development Agreement.

**3.    Reporting and Payment**

- Coursera Monetization Model:

    Payment of the Revenue Share and Additional Revenue Share by Company to University will be on a calendar quarter basis. Within 30 days after the end of each calendar quarter, Company will calculate and pay to University the appropriate amount of the Revenue Share and Additional Revenue Share and provide a report indicating how such amounts were determined.

- University Monetization Model:

    Payment of the amount due to Company as agreed in a Course Development Agreement will be on a calendar quarter basis. Within 30 days after the end of each calendar quarter, University will calculate and pay to Company the appropriate amount and provide a report indicating how such amount was determined and that specifies in reasonable detail the sources and amount of gross revenue and the categories and amounts per category of deductions taken in calculating the amount due.

**Exhibit C**
**Marks Usage Guidelines**

The Company will not use the name, logo, or seal, of the University or its employees in any advertisement, press release or publicity with reference to this Agreement or any product or service resulting from this Agreement, without prior written approval of the University.

**Exhibit D**
**Governance**

<u>Selection of Partner Institutions.</u>  It is Company's intent to offer on its Platform only Content provided by top-quality educational institutions.  Within North America, Company will host and provide only Content provided by universities that are a member of the Association of American Universities; provided, however, that Company may devote part of its Services to Content provided by universities outside of North America, provided that such universities are limited to the generally regarded "top five" universities within any country in any given year, as ranked by the current Academic Ranking of World Universities, or any replacement or successor organization.  If Company desires to provide Content for any other universities or content providers, Company will be required to obtain the prior approval of the University Advisory Board; provided, however, that no such approval is needed for Company to develop any website, offer any Content or services, or license its Platform or other technology to third parties for use on any third-party website, as long as the website is not located at coursera.org or subdomain name thereof and does not use the brand or name of University.

<u>Role of the University Advisory Board</u>:  The University Advisory Board will serve the following role:

- Advise Company regarding academic decisions (including the selection and provision of new Content).

- Serve as the final arbiter in cases involving disagreements or disputes between the Parties regarding (i) acceptance of University Courses for hosting on the Platform, (ii) the pullout of any Content from offering on the Platform and (iii) issues relating to determination of Revenue Share.

- Review the Platform and Services for the purpose of evaluating pedagogy, Content, effectiveness, suitability and other relevant metrics as may be decided from time to time and making suggestions to Company with respect thereto.

**Exhibit E**
**Course Development Agreement**
**(Agreed Upon Specifications and Content for Course)**

<u>**Course Specifications:**</u>

| | |
|---|---|
| Course Title and Number | |
| Instructor(s) | |
| Class Length (weeks) | |
| Hours per week | |
| Frequency of In-Video Quizzes | |
| Number of Problem Sets | |
| Number of Programming Assignments | |

**Description of Course Content**

Description of programming assignments
- Programming language(s)
- Autograding approach (unit testing? output comparison?)
- Are End Users allowed multiple submissions?

Description of problem sets
- Format of questions used (short answer questions, multiple choice, etc.)
- Randomized choice of questions (allowing for multiple submissions)
- Other forms of assessment (e.g., peer grading)

Any other assignments

<u>**Course Offering and Monetization Model:**</u>

| | |
|---|---|
| Monetization Model | |
| Monetization Strategies | |
| Pricing | |
| Initial Period | |
| Revenue Share | |
| Advance notice period for Removal Request (if different than 90 days) | |

**Instructor Responsibilities**

The teaching staff will be responsible for:
- Creating the video lecture Content (including video editing and chunking into short videos).

- Creating appropriate assessments, so as to have a rigorous, meaningful, measure of End User learning.
- Software development on any special-purpose assessments required for the class, except by agreement of Company, at its own discretion, to help develop such assessments.
- Copyright clearance: Ensuring that the Content (lectures + assessments) are clear of copyright issues, as per University-provided guidelines.
- Uploading the video Content, assessments (quizzes), and slides used to the hosting Platform (together with any other relevant content, such as web pages, etc.).
- Uploading any slides used in the videos together with the videos.
- Uploading appropriate text descriptions of images in quizzes.
- Working with University and Company to provide any necessary accommodations for End Users with disabilities.
- In the first course offering, monitoring the Q&A forum to ensure that major problems in video Content or assessments are addressed.

**Agreed to and accepted by:**

For Company: (signature) _____

Name _____   Title: _____   Date: _____


For University: (signature) _____

Name _____   Title: _____   Date: _____


**Read and Acknowledged**

For Instructor(s): (signature) _____

Name _____   Title: _____   Date: _____

**Exhibit F**
**ADA Compliance Protocol**

Company will use commercially reasonable efforts to make the Platform reasonably accessible to End Users with disabilities, including End Users with visual impairments using a screen reader technology.

For Content provided in any Course for which enrollment is open to the general public, without need for a registration process, University will provide the following materials proactively, at the time the Course Content is uploaded onto the Company Website:

- Any slides, with their annotations, used in the production of the videos.
- A text annotation file describing any images used in quizzes or problem sets, to allow End Users with limited vision to access these quizzes without requiring assistance; this file must be provided in a format accessible to screen reader technology (as per guidelines provided by Company).

Company will provide capability to check that these materials were uploaded onto the Company Website prior to opening the Content to the public.

Company will provide an "Audio Text Transcript" for the audio stream, as follows:

- For all University Courses offered to the public under the Coursera Monetization Model whose initial enrollment is above 10,000 End Users, the audio will be proactively captioned within seven days of the time that the Instructor uploads the video onto the Website.

- For all University Courses offered to the public under the Coursera Monetization Model whose initial enrollment is fewer than 10,000, the audio will be captioned upon request by and End User with a disability, in a timely manner, as specified below.

- For any University Courses under the University Monetization Model or the Registered Students Model for which University requests such captions, at an agreed-upon fee.

When Content is not audio captioned proactively, then upon request (by End User or by University), Company will provide captions for the first week of Content within seven days of request, and then subsequent weeks' materials at seven days intervals thereafter.

To address accessibility needs for which the above-mentioned accommodations are insufficient, Company and University will implement the following protocol. Upon an accommodation request, Company and University will enter into a good-faith discussion with the End User to find an appropriate form of accommodation that can be provided using reasonable effort and without undue burden. Company's contact information for such requests will be provided on the Company Website, and inquiries will be responded to in a timely manner, typically within one business day.

If Company and University determine that it is necessary, the accommodation can be up to providing a "Video Text Transcript" of the video stream, in which the audio captions are interspersed with a text description of graphical elements on the slides and other visual elements of the lecture. The Video Text Transcript for the first week will be provided within ten days of the time of the request, and then subsequent weeks' material will be provided at seven day intervals thereafter.

Should the need for accommodations cause delays for End Users with disabilities, appropriate extensions on deadlines will be given. Extensions to deadlines will be given to End Users with learning disabilities as needed. As another option, should another offering of the Course be planned for the near future, Company will determine whether the End User is willing to postpone enrollment in the Course until that next offering, allowing Company and University to prepare the accommodation materials proactively, so that the End User can receive the annotated materials on the same schedule as other End Users.

To prepare a Video Text Transcript, Company will provide University with the Audio Text Transcript, as specified above, to the extent such transcripts have been created by Company. Descriptions of any graphical elements in the slides or video can then be injected into the Audio Text Transcript by University or its teaching staff to complete the Video Text Transcript. Company will also provide a capability for collecting and displaying "crowd-sourced" annotations to Content, allowing End Users participating in the Course to help provide the necessary annotations. Company will use means at its disposal (such as badges and other forms of recognition) to encourage End Users to participate in this effort.

**Exhibit H**
**University Linking Guidelines**

University website: ocw.uci.edu

## Schedule 1
### Possible Company Monetization Strategies

1. **Certification:** Company will provide certificates that can be purchased by End Users; these certificates, which do not carry University credit, will certify achievement by End Users of an Instructor-specified threshold of performance for a particular Course. These certificates might be provided either as (a) a signed pdf document, or (b) a badge posted on LinkedIn, Facebook, Google+, or other community websites, via a recognized badging system. The allowed forms of the Certificate or Badge are as shown in Schedule 2.

2. **Secure assessments:** Company may provide an End User, for a fee, the capability to undergo identity-verified testing at a private location or in a certified testing location.

3. **Employee recruiting:** With End User consent (via opting into emails of this type), Company will allow prospective Employers (whether an employer or a recruiter) to execute queries against End User records. These queries might involve End User performance in relevant Courses (as specified in the query) as well as End User-supplied demographic information (such as education or geographical location). Company will then allow Employers to email End Users via the Platform, to propose employment opportunities. Company will not reveal End User contact information to the Employer. End Users may choose to respond to the email with their contact information at their discretion.

4. **Employee or University screening:** Company will provide a prospective Employer the capability to assess prospective employees for a given level of expertise in Courses provided by Company, by having the prospective Employee take a set of assessments in a proctored environment at the Employer site. A similar model will be offered to Universities who want to verify a level of knowledge in incoming End Users (e.g., for evaluating course waiver requests).

5. **Human-provided tutoring or manual grading:** Company will provide access to (paid) human tutoring, grading, or other forms of human academic support.

6. **Corporate/university enterprise model:** Company will provide Employers access to an Enterprise Version of the Platform, which will allow Employers to (a) use the Content for training Employees (Trainees) using Courses provided on the Platform, (b) provide Employer instructors access to Trainee performance records, for the purposes of gauging performance and assisting Trainees in learning. Employers might also augment University-provided Courses on the Platform with additional Content of particular relevance to their own employee pool. Such Content will be accessible only to Employer's Trainees. The same model can be used to provide an Enterprise Version of the Platform to non-University academic institutions (e.g., community colleges) that seek to offer their registered End Users higher-quality courses at a lower cost, for credit at these non-University institutions.

7. **Sponsorships:** Company will allow third party sponsorships of Courses, by foundations or companies, using appropriate and non-intrusive visual elements on the Course webpage. A

sponsor will require the approval by University and Instructor, but such approval will not be unreasonably withheld without cause.

8. **Tuition fees**:  For certain Courses, a tuition free may be charges of End Users for access to the Course content (usually after a short initial viewing period where access is free).  This fee will be mutually agreed to by University and Company.  In the standard procedure, an End User will be allowed to indicate "Financial Hardship", upon which tuition fees are automatically waived with respect to access to Course Content.  Certification to an End User declaring financial hardship may or may not be provided, as agreed upon by University and Company.

9. **Selling or facilitating the sale of Course materials**: Company may sell Course materials (*e.g.*, books or Course readers required or recommended by the Instructor); these materials will be provided by University or Instructor, or by a third party.  The Company Website may also point to third-party sites where Course materials can be purchased, and collect fees from such third parties.

10. **Transcript services**: Company may keep grade transcripts for End Users completing Courses on the Platform and provide these grades upon request, with End User permission, to third parties wanting to verify End User performance.

**Schedule 2**
**Allowed Forms of the Certificates or Badges**

Company may offer certificates of completion to End Users so long as no representation, as per Exhibit C, Marks Usage Guidelines, is made that said certificates confer upon End Users any status with University, nor is the certificate recognized by the University as conferring either degree credit or continuing education units.

# EXHIBIT "2"



UNIVERSITY OF CALIFORNIA, IRVINE

BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO    SANTA BARBARA · SANTA CRUZ

Office of the Provost and Executive Vice Chancellor      509Aldrich Hall
Irvine, CA 92697-1000
(949) 824-6296
FAX (949) 824-2438

January 24, 2014

*Via Electronic and U.S. Mail*

Hugh Hewitt
Hewitt & Wolensky
40401 MacArthur Boulevard, Suite 300
Irvine, CA  92660

Re:    **Whistleblower Complaint – File No. 2013-3871**
        **Complainant: Professor Richard McKenzie**

Dear Mr. Hewitt,

I am writing concerning the Whistleblower Complaint submitted by Professor Richard McKenzie on May 16, 2013.

The University's investigator has determined that Dean Matkin, in his capacity as Dean of Continuing Education, failed to have safeguards in place that would protect the intellectual property rights of Professor McKenzie prior to the release of his course on the Coursera platform.

The remaining allegations in the Complaint were not substantiated.

We appreciate your bringing this to our attention.

Sincerely,

Michael R. Arias
Associate Executive Vice Chancellor and
Locally Designated Official

MRA:kba

65

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| RICHARD MCKENZIE | THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; GARY MATKIN; COURSERA, INC.; DAPHNE KOLLER |

| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) Hugh Hewitt, Esq. Hewitt Wolensky & McNulty LLP, Newport Beach, CA 92660; Tel: (949) 783-5050 | **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT: $** $230,000.00 +

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
42 USC Section 1983; The Regents and other defendants converted a professor's property and retaliated when he complained about due process violation.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** ☐ 463 Alien Detainee | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 510 Motions to Vacate Sentence | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 535 Death Penalty | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** ☐ 310 Airplane | **PERSONAL PROPERTY** ☐ 370 Other Fraud | **Other:** ☐ 540 Mandamus/Other | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 340 Marine | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **LABOR** | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 740 Railway Labor Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 790 Other Labor Litigation | |
| | ☐ 230 Rent Lease & Ejectment | | ☐ 446 American with Disabilities-Other | ☐ 791 Employee Ret. Inc. Security Act | |
| | | | ☐ 448 Education | | |

**FOR OFFICE USE ONLY:** Case Number: SACV14-00149 JVS (JPRx)

**AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES**: Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES**: Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | Richard McKenzie |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Alameda<br>Orange<br>Santa Clara | The Regents of the University of California<br>Gary Matkin<br>Coursera, Inc. |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

*****Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note:** In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _Elizabeth V. Mchnit_   DATE: 02/03/2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

Richard McKenzie v. The Regents of the University of California, et al.

Civil Case Cover Sheet
Additional Page

IX. VENUE

(b)

**County in this District**

Santa Clara                              Daphne Koller